PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MICHAEL ALAN LEVENITE, a/k/a
Nomad,
*Defendant-Appellant.*

No. 00-4197

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MICHAEL ALAN LEVENITE, a/k/a
Nomad,
*Defendant-Appellant.*

No. 00-4198

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

TRAVIS CHAD DAILEY, a/k/a "Taz",
*Defendant-Appellant.*

No. 00-4199

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.                                    No. 00-4255

RICHARD FREDERICK CONNOR, a/k/a
Phez,

            *Defendant-Appellant.*


UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.                                    No. 00-4468

KEITH ALAN WATSON, a/k/a Tank,
            *Defendant-Appellant.*


Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Henry C. Morgan, Jr., District Judge.
(CR-99-23, CR-99-91)

Argued: October 30, 2001

Decided: January 10, 2002

Before NIEMEYER, WILLIAMS, and MICHAEL, Circuit Judges.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Williams and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** William James Holmes, Virginia Beach, Virginia, for Appellant Connor; John Warren Hart, JOHN W. HART, P.C., Vir-

ginia Beach, Virginia, for Appellant Levenite; Marlin Woodrow Griffin, Jr., Hampton, Virginia, for Appellant Dailey; Douglas Fredericks, Norfolk, Virginia, for Appellant Watson. Fernando Groene, Assistant United States Attorney, Norfolk, Virginia, for Appellee. **ON BRIEF:** Kenneth E. Melson, United States Attorney, Robert J. Seidel, Jr., Assistant United States Attorney, Norfolk, Virginia, for Appellee.

---

## OPINION

NIEMEYER, Circuit Judge:

Michael Levenite, Travis Dailey, Richard Connor, and Keith Watson were convicted of participating in a large-scale methamphetamine trafficking conspiracy in Norfolk, Virginia. Levenite was sentenced to 94 months' imprisonment; Dailey to 174 months; Connor to 21 months; and Watson to 188 months.

On appeal, all four challenge the testimony of an FBI-paid informant who received expenses and could earn, in the discretion of the FBI, an additional $100,000 bonus, depending on the informant's cooperation and attainment of the objectives of the investigation. They contend that the use of such testimony violated 18 U.S.C. § 201(c) (punishing the bribery of witnesses) and the Due Process Clause of the Fifth Amendment. They also challenge the district court's decision, under Federal Rule of Criminal Procedure 23(b), to permit an 11-person jury to deliberate and reach a verdict when one of the jurors had become ill. Connor and Watson challenge the physical configuration of the courtroom, altered to accommodate a trial involving 13 defendants, arguing that it denied them an ability to look witnesses in the eye and to consult counsel, in violation of the Confrontation and Assistance-of-Counsel Clauses of the Sixth Amendment. Levenite, Dailey and Connor challenge the sufficiency of evidence offered to support their convictions. Finally, Levenite challenges two sentencing decisions.

For the reasons that follow, we affirm.

### I

In April 1993, Jeremiah Saucier moved from California to Norfolk, Virginia, for the purpose of distributing methamphetamine with Har-

old Ratliff. Over the next three years, Saucier organized a coast-to-coast drug distribution network which was supplied by Juan Felix in California. Felix shipped the drugs from California by either FedEx or UPS to Saucier who then distributed them in Virginia to smaller distributors such as Keith Watson and Travis Dailey. Watson and Dailey, in turn, distributed the drugs to yet smaller distributors or to customers. Several members of the conspiracy were also members of the Renegade Motorcycle Club (the "Renegades").

In October 1996, Saucier was involved in a serious motorcycle accident, and William Yates, one of Saucier's customers, took over leadership of the conspiracy until it was terminated by indictments filed in February 1999 and subsequent arrests.

Through the operation of the conspiracy, hundreds of pounds of methamphetamine, worth millions of dollars, as well as smaller amounts of cocaine, were distributed over a period of almost six years.

Investigation of the conspiracy began in earnest when a drug-sniffing dog at the Norfolk airport "alerted on" a package being shipped to Felix in California. The package contained $145,000 in U.S. currency that was being sent to Felix in payment for methamphetamine. In addition to using surveillance, court authorized wire taps, and undercover agents, the FBI engaged Robert Lowe as a paid, confidential informant. Lowe, who infiltrated the conspiracy and the Renegades itself and testified at substantial length against the members of the conspiracy at trial, was paid a "salary" as well as expenses. Under his arrangement with the FBI, Lowe could also earn a lump-sum payment of up to $100,000, at the discretion of the FBI, depending on the extent of his cooperation in the investigation and his effectiveness in helping the FBI attain the objectives of the investigation. Later, before trial, Lowe was placed in the government's witness protection program.

In February 1999, 30 members of the conspiracy were charged with trafficking in methamphetamine and related offenses in a 66-count indictment, and in June 1999, 11 defendants charged in the original indictment were charged in a supplemental indictment with

enhancement offenses. The two indictments were thereafter consolidated for trial.

Seventeen of the defendants pleaded guilty, and several of them, including Saucier, Yates, and Felix, testified on behalf of the government at trial. Following trial, the jury acquitted five defendants and found eight guilty of various offenses, including some lesser included offenses. Four convicted defendants — Levenite, Dailey, Connor, and Watson — filed this appeal.

## II

All defendants on appeal contend that the testimony given by Robert Lowe, a paid confidential informant for the FBI, was incompetent and constitutionally inadmissible. They assert that as part of Lowe's compensation, the FBI agreed to pay Lowe "a lump sum cash 'bonus' of up to $100,000.00 which was contingent upon the testimony of Rob Lowe against these defendants and the outcome of this case, including whether convictions against these specific defendants were obtained." Characterizing the arrangement as "extremely disturbing" and offensive, these defendants argue that the FBI's arrangement with Lowe violated 18 U.S.C. § 201(c) (punishing bribery of public officials and witnesses) and the Due Process Clause of the Fifth Amendment. Based on these alleged violations, the defendants request a new trial.

The government contends that Lowe "was paid for his truthful testimony" and that procedural safeguards were instituted to protect the defendants from any impropriety, including the government's full pretrial disclosure of the arrangement, the defendants' and court's pretrial review of the arrangement through suppression motions, the defendants' cross-examination of the FBI's case agent and Lowe, the government's corroboration of Lowe's testimony through other evidence, and the court's cautionary instructions to the jury. The government argues accordingly that Lowe's testimony was both competent and admissible.

The FBI first engaged Lowe in September 1996 as a confidential informant who would gather information about drug distribution and the Renegades and would report the information to the FBI. At that

time, however, Lowe did not want to testify in any court; his role was to serve "strictly [as] eyes and ears." Approximately a year later, Lowe agreed to become a cooperating witness, subject to direction by the FBI as to "where to go [and] when to go." The relationship was governed by a four-page written agreement between Lowe and the FBI, dated October 15, 1997.

The agreement recited that the FBI was conducting an investigation into racketeering and drug distribution by "an outlaw motorcycle organization known as the Renegades" and that Lowe had information and was willing to "furnish assistance" to the FBI. Under the agreement, Lowe agreed to disclose information to the FBI, to introduce undercover FBI agents to members of the Renegades, to wear wires and make recordings, and to testify in "any and all court proceedings." He agreed not to *initiate* any criminal acts and not to *participate* in unlawful acts except as authorized by the FBI. The FBI retained the right to control the investigation, as well as the right to terminate it at any time.

In accordance with the agreement, Lowe received $2,000 per month for his services and $1,300 per month for his expenses. Later, the FBI also purchased a motorcycle for him so that he could become a member of the Renegades. In addition, the agreement provided for a potential lump-sum payment of up to $100,000, at the discretion of the FBI at the end of the case. With respect to this $100,000 payment, the agreement provided:

> The FBI may, at its sole option and choice, elect to furnish Mr. Lowe with a lump sum of money, not to exceed $100,000.00, upon the completion of the investigation. Factors to be considered by the FBI in [determining] the amount shall include, but not be limited to the following: the extent of cooperation in the investigation by Mr. Lowe, the activities of Mr. Lowe in the furtherance of the investigation and in attaining the objectives of the investigation, and the degree of compliance with this Agreement by Mr. Lowe.

The agreement not only made any payment contingent upon Lowe's compliance with the agreement but also upon his maintenance of confidentiality.

After signing the agreement, Lowe worked virtually full time for the FBI in connection with the investigation of the Renegades, and he was elected a member of the Renegade Motorcycle Club. In February 1999, Lowe was formally placed in the Witness Protection Program, authorized by 18 U.S.C. § 3521, under which he was given protection and paid additional personal expenses.

At trial, Lowe testified at length about what he had witnessed, providing substantial evidence against each of the defendants. His testimony against Connor provided most of the evidence supporting Connor's conviction.

Before trial, the district court considered and denied motions to suppress evidence from Lowe, and at trial, it overruled objections to receipt of Lowe's testimony. Although the district court permitted Lowe to testify, it expressed concerns to the government:

> Well, you've got this case, and you are going to put it on for many weeks; and sometimes I'm surprised at the government taking the risks that it does by asking the court to accept certain evidence when they've got other evidence. And if you wish to present this witness, based on what I've heard, I'm not going to prevent it.

The court added that Lowe's arrangement with the FBI "makes me nervous."

When the FBI case agent, Kim Wright, was cross-examined at trial about the agreement with Lowe, she testified that FBI headquarters, not any individual agent in the field, would determine the size of the payment that Lowe would receive at the end of the case. She agreed that the payment would be based in part on the extent to which the "objectives of the investigation" had been attained and she conceded that among those objectives were the convictions of conspirators identified through the investigation. Wright stated that after the case was over, she would write a recommendation report to FBI headquarters that would be used to determine the amount of payment to Lowe.

The defendants cross-examined both Agent Wright and Lowe about their arrangement, and at the completion of the case, the district court instructed the jury as follows:

> You have heard testimony from paid informants who were employed by the Government to investigate the defendants. The fact that an individual is a paid informant does not disqualify him as a witness. The uncorroborated testimony of a paid informant may be a sufficient basis for a finding of guilt if you believe beyond a reasonable doubt that such testimony is both credible and of sufficient weight. It is neither illegal nor improper to utilize paid informants in the enforcement of the criminal laws. However, the testimony of a paid informant must be subjected to a higher degree of scrutiny as to both weight and credibility. This is true because you must decide if such a witness has a greater motive to testify truthfully or falsely.
>
> Further, if the payment to the informant is fully or partially contingent upon the content of his testimony at trial or upon a finding of guilt at trial, then such testimony must be subjected to an even higher degree of scrutiny.

Challenging Lowe's testimony, the defendants argue first that the provision for a bonus of up to $100,000 violated 18 U.S.C. §§ 201(c)(2) and 201(c)(3), which provide that whoever gives or receives "anything of value . . . for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial" shall be punished. The defendants say "Robert Ira Lowe was essentially offered, and he accepted, a bribe," in violation of § 201(c).

As we noted recently, § 201 was enacted to strengthen the laws relating to bribery and not to restrict the government from compensating witnesses that help expose and prosecute criminal activity. *See United States v. Anty*, 203 F.3d 305, 308 (4th Cir. 2000); *United States v. Richardson*, 195 F.3d 192, 196-97 (4th Cir. 1999). In *Anty* we explained:

> To interpret § 201(c)(2) to preclude the payment of money to informants to assist in investigating and prosecuting crimes, by giving truthful testimony, would not only "rob the government of its long-standing prerogative[ ]" to do so as established by statute and recognized practice, it would

also "work an obvious absurdity" in implicitly repealing numerous statutes that authorize the payment of expenses, fees, and rewards to witnesses.

*Id.* at 309 (quoting *Richardson*, 195 F.3d at 196). We noted that § 201 explicitly authorizes the government to pay witnesses fees as authorized by law. *See* 18 U.S.C. § 201(d). As the government points out, there are several statutes that allow the government to pay informants and witnesses for their cooperation, services, and testimony. *See, e.g.,* 21 U.S.C. § 886(a) (authorizing payments in connection with drug enforcement of "such sum or sums of money as [the Attorney General] may deem appropriate, without reference to any moieties or rewards to which such person may otherwise be entitled by law"); 18 U.S.C. § 3059B (authorizing payment of reward "to any individual who assists the Department of Justice in performing its functions"). Thus, we held in *Anty* that § 201(c) "does not prohibit the United States from acting in accordance with long-standing practice and statutory authority to pay fees, expenses, and rewards to informants even when the payment is solely for testimony, so long as the payment is not for or because of any corruption of the truth of testimony." *Id.* at 311. Accordingly, the defendants' statutory argument lacks any merit.

The defendants also argue that even if the arrangement does not violate § 201, it nevertheless violates their right to due process. They argue that "payments which are contingent upon a conviction or upon the outcome of a trial 'skate very close to, if indeed, do not cross, the limits imposed by the due process clause,'" quoting *United States v. Dailey*, 759 F.2d 192, 201 (1st Cir. 1985). They rightly assert, of course, that government sponsored or encouraged perjury deliberately presented to a jury to support a conviction would violate a defendant's right to due process. *See Mooney v. Holohan*, 294 U.S. 103, 112 (1935). But they have directed us to no evidence that the government sponsored or suborned perjury. Indeed, most, if not all, of Lowe's testimony was corroborated to some degree; where direct corroboration was lacking, circumstantial indications of trustworthiness existed.

Nevertheless, arrangements such as the one between the FBI and Lowe create fertile fields from which truth-bending or even perjury could grow, threatening the core of a trial's legitimacy. Yet, even

though compensation for testimony can be troubling, it does not follow that the use of such an arrangement renders such testimony constitutionally inadmissible *per se*. *In Hoffa v. United States*, 385 U.S. 293, 311 (1966), the Supreme Court stated about testimony given by paid informants:

> The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.

*Id.*; *see also Anty*, 203 F.3d at 312 (noting the importance of protecting the defendant's right to cross-examine); *United States v. Wilson*, 904 F.2d 656, 659 (11th Cir. 1990) (same); *United States v. Cervantes-Pacheco*, 826 F.2d 310, 313-16 (5th Cir. 1987) (en banc) (citing *Hoffa* and discussing procedural safeguards to protect against abuses).

The task of obtaining truthful testimony to prosecute criminal matters often presents a difficult challenge to the government. Witnesses to criminal conduct are routinely either in conspiracy with the defendants or at risk of harm because they bore witness to criminal conduct. In either case, the government frequently faces barriers to obtaining relevant, truthful testimony. Therefore, it has long been recognized that grants of immunity, plea agreements, and sentencing leniency are appropriate tools for use in the criminal justice system. Indeed, the Rules of Criminal Procedure explicitly authorize these devices, and this court has approved them. *See, e.g.*, Fed. R. Crim. P. 11(e); *United States v. Richardson*, 195 F.3d 192, 194-97 (4th Cir. 1999). Similarly, the payment of fees to witnesses as an incentive to come forward and testify has explicitly been approved by Congress. *See, e.g.*, 18 U.S.C. § 3059B; 21 U.S.C. § 886(a); *Anty*, 203 F.3d at 309-10 (listing statutes permitting such payments).

But just as a payment may provide witnesses an incentive to come forward and testify truthfully at some risk to themselves, so too can the same payment provide an incentive to witnesses to come forward and lie simply for the purpose of receiving the payment. Even so, as long as there are adequate safeguards, the potential corruption should not condemn the practice. Indeed, in some rare cases, even a payment

contingent on specific truthful testimony might be justifiable. For instance, when the government is confident before trial about the truthfulness of a witness's testimony but unsure that the witness will adhere to such testimony in the face of external pressure from "the street" or otherwise, a payment might be approved that is deferred and dependent on the witness' giving of truthful testimony. But because of the vulnerability of such contingent-payment arrangements to corruption, they may be approved only rarely and under the highest scrutiny.

In recognition of the substantial risk that financial incentives can corrupt, either through an aggressive prosecutor seeking testimony inconsistent with the truth or a witness testifying untruthfully to satisfy the government's objectives, testimony given under an arrangement involving the payment of a fee, "salary," or "bonus," whether contingent on the content of the testimony or not, may be received in court only within a structure of procedural safeguards.

First, a witness-fee payment arrangement must be disclosed to each defendant against whom the witness will testify before the proceeding at which the witness testifies. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) (holding that evidence affecting the credibility of a key witness is material); *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that due process forbids suppression by the prosecution of [material] evidence favorable to an accused when requested); *Anty*, 203 F.3d at 312 (noting the importance of protecting a defendant's right to be apprised of the government's compensation arrangement with a witness). Second, the defendant must be afforded an opportunity to cross-examine the witness about the fee arrangement. *Anty*, 203 F.3d at 312. Third, the court must instruct the jury about the heightened scrutiny to be given testimony provided under a fee payment arrangement. *Wilson*, 904 F.2d at 659. And finally, there can be no indication that the government is sponsoring or suborning perjury. *Cervantes-Pacheco*, 826 F.2d at 315 ("The government of course must not deliberately use perjured testimony or encourage the use of perjured testimony"). In addition, when the payment of a fee, "salary," or "bonus" is contingent on the content or nature of testimony given, the court must ascertain (1) that the government has independent means, such as corroborating evidence, by which to measure the truthfulness of the witness' testimony and (2) that the contingency is

expressly linked to the witness' testifying truthfully. Moreover, when a witness is testifying under such a contingent payment arrangement, the government has a duty to inform the court and opposing counsel when the witness' testimony is inconsistent with the government's expectation.

Turning to whether these safeguards were applied in this case, first, there is no dispute that the agreement between the FBI and Lowe was disclosed to the defendants before trial. Indeed, in this case, the agreement was scrutinized before trial through the defendants' suppression motion.

Second, at trial, the defendants had the opportunity to cross-examine both FBI case agent Wright and confidential informant Lowe about the terms of the agreement, its operation, and its effect. And they took that opportunity by cross-examining both.

Third, the jury was instructed to give Lowe's testimony heightened scrutiny. As the court stated to the jury, "the testimony of a paid informant must be subjected to a higher degree of scrutiny as to both weight and credibility. This is true because you must decide if such a witness has a greater motive to testify truthfully or falsely." The court went on to note that if the jury were to conclude that the payment to the informant was "fully or partially contingent upon the content of his testimony at trial or upon a finding of guilt," then the jury was to subject that witness's testimony "to an even higher degree of scrutiny."

Finally, there was no indication that the FBI or the government prosecutors were sponsoring or suborning perjury to any degree. Indeed, when using Lowe during the investigation, the FBI instituted safeguards by accompanying him, watching him, and debriefing him promptly after he witnessed various incidents. And during trial, the government offered not only Lowe's testimony, but also corroborating testimony, as well as testimony revealing the FBI's use of the safeguards.

In short, the necessary safeguards were fully employed.

The defendants contend that Lowe's fee agreement was also contingent on his giving testimony that would convict the defendants. This assertion, however, is not supported by the record. Lowe was engaged through a written contract to assist in the investigation and prosecution of the Renegades. The effort was a long-term and risky undertaking. Consequently, the FBI was faced with the possibility that Lowe would abandon his assistance and thereby substantially damage an important investigation. To provide an incentive for Lowe to remain involved until his assistance would no longer be necessary would require deferment of his "bonus" until the case was complete.

Such an incentive to remain involved until the end was precisely what the agreement in this case provided. It gave the FBI the "sole option and choice" to provide Lowe with a lump sum payment up to $100,000, based upon "the extent of cooperation in the investigation by Mr. Lowe, the activities of Mr. Lowe in furtherance of the investigation and in attaining the objectives of the investigation, and the degree of compliance with this Agreement by Mr. Lowe." But this agreement does not mean that payment was contingent on any particular testimony or trial outcome. It means that Lowe was required to present fully and accurately to the jury whatever he witnessed during the course of the investigation. Obviously, the objective of this criminal investigation, as any criminal investigation, was to uncover criminal activity and convict the guilty. It was, therefore, not surprising that the FBI case agent testified that one of the objectives in the investigation was to attain convictions. But that explanation cannot be interpreted to mean that payment was contingent on anything but truthful testimony by the witness as to what he saw during the investigation. Indeed, the agreement explicitly required that Lowe not commit any unlawful activities — such as perjury — in carrying out the agreement.

In sum, the FBI reasonably found it necessary in this case to enter into the fee arrangement with Lowe as an undercover informant, and it appropriately monitored his conduct. There is no evidence that the government knowingly used or suborned any untruthful testimony. The arrangement with Lowe was fully disclosed to the defendants, and the defendants were permitted to cross-examine witnesses fully about it and argue to the jury that Lowe's credibility should be discounted or doubted. Finally, the court admonished the jury to evaluate

Lowe's testimony more carefully because of the arrangement. In these circumstances, we conclude that the evidence was not constitutionally inadmissible and that "[t]he Constitution does not require us to upset the jury's verdict." *Hoffa*, 385 U.S. at 312.

III

All four defendants also contend that the district court abused its discretion in allowing an 11-person jury to complete deliberations and return a verdict after one juror fell ill.

Upon the completion of the eight-week jury trial in this case, after the alternate jurors had been discharged, a 12-person jury began its deliberations. On the third day of deliberations — Friday, November 5, 1999 — one juror failed to appear because she was ill with an intestinal flu. When the district court consulted counsel about their preference from among several available options for proceeding, two defendants (not appellants) opted to permit the jury to continue deliberating as an 11-person jury under Federal Rule of Criminal Procedure 23(b). The government and the four defendants in this appeal proposed delaying the continuation of deliberations for three days until Monday, November 8, to allow for the possible return of the ill juror.

After considering various options — including declaring a mistrial, impaneling an alternate juror, delaying deliberations for three days, or proceeding with an 11-person jury — the district court opted to proceed with an 11-person jury, as authorized by Rule 23(b). Explaining its decision, the court rejected a mistrial as the least desirable alternative. Indeed, a mistrial may not even have been available because any necessity for one was probably obviated by the authority granted by Rule 23(b). The court also reasoned that impaneling an alternate juror would require that the jury begin deliberations anew, a task that the court thought would be difficult at best, and constitutionally suspect. The court felt that delaying deliberations until the Monday after the weekend risked losing more jurors, particularly in view of the fact that the intestinal flu was contagious. It reasoned that if an 11-person jury were unable to reach a verdict on Friday, the court would still have the option of impaneling an alternate juror, should other jurors

be lost by then. The court also supported its decision with the reasoning outlined in the Advisory Committee Notes to Rule 23(b).

The Advisory Committee Notes to Rule 23(b) observe that the problem of losing a juror after commencement of deliberations "is acute when the trial has been a lengthy one and consequently the remedy of mistrial would necessitate a second expenditure of substantial prosecution, defense and court resources." The Notes also observe that "[t]o permit substitution of an alternate [juror] after deliberations ha[d] begun would require either that the alternate participate though he has missed part of the jury discussion, or that he sit in with the jury in every case on the chance he might be needed. Either course is subject to practical difficulty and to strong constitutional objection." (Quoting Wright, *Federal Practice and Procedure* § 388 (1969)).

In the circumstances of this case, we conclude that the district court acted well within its discretion. The parties do not dispute the district court's authority to proceed with 11 persons, and the district court opted for this alternative after assessing the legal risks of impaneling an alternate juror and the factual risks of losing jurors from delay. Accordingly, we find no abuse of discretion. *See United States v. Acker*, 52 F.3d 509, 515-16 (4th Cir. 1995) (permitting an 11-person jury under Rule 23 when a juror was excused for an injury and it was unclear when she would be able to return).

IV

Defendants Connor and Watson contend that the physical configuration of the trial courtroom denied them their Sixth Amendment rights of confrontation and the assistance of counsel.

Because this trial involved 13 defendants and their counsel, size limitations of the courtroom dictated that each defendant be seated behind his counsel. Under this seating arrangement, Connor and Watson were seated six feet behind their counsel, and they could see only the backs of witnesses. While their counsel were free to move about the courtroom and to cross-examine witnesses face-to-face, security concerns meant that the defendants themselves could not move about freely. They were, however, permitted to consult freely with their

counsel, either by leaning forward and speaking directly to counsel or by passing notes.

At the beginning of the trial, Watson's counsel objected to the location of his chair, lamenting that he was "sitting here, the thirteenth lawyer in a row. I'm some six feet from my client." The substance of his objection focused on "fundamental fairness." He stated:

> The way the courtroom is configured, I'm looking at the back of the witness's head, and so I rise most humbly to object on a basic fundamental fairness in this trial, that is impossible for these 13 gentlemen to be tried fairly in this court.

To meet counsel's objection, the court stated, "If counsel wishes to rise during the jury selection process or during the questioning of witnesses so that they can see the witness, they are free to do so." With that assurance, nothing further was said and the objection counsel for Watson was making had apparently been accommodated.

Both Connor and Watson now contend, for the first time on appeal, that they individually, as distinct from their counsel, could not see the faces of witnesses and that this violated the Sixth Amendment. We reject this claim because nothing in the defendants' brief nor in the record suggests that they can establish the elements required for noticing and correcting plain error. *See United States v. Olano*, 507 U.S. 725 (1993); *Coy v. Iowa*, 487 U.S. 1012, 1021 (1988) (noting that a denial of face-to-face confrontation is subject to harmless error analysis). In addition, Watson and Connor press the argument made by Watson's counsel at trial that the placement of these defendants six feet behind their counsel denied them the assistance of counsel, in violation of the Sixth Amendment. We disagree. Counsel and client were free to consult throughout the trial, and there was no evidence that either defendant's ability to communicate with his attorney and assist in his defense was impaired. *See United States v. Balsam*, 203 F.3d 72, 81-82 (1st Cir. 2000) (holding that defendants seated four to five feet from defense table and permitted to "consult freely" with counsel were not denied assistance of counsel); *United States v. Jones*, 766 F.2d 994, 1004 (6th Cir. 1985) (holding that in a trial of 18 defendants where the defendants were seated in two rows behind

counsel's table, there was no Sixth Amendment violation because defendants were able to communicate with their attorneys during trial).

V

Connor, Dailey, and Levenite contend that the evidence presented by the government was insufficient to support their convictions. Our standard for reviewing jury verdicts is deferential. We uphold a verdict if "'there is substantial evidence, taking the view most favorable to the Government, to support it.'" *United States v. Wilson*, 135 F.3d 291, 303 (4th Cir. 1998) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)).

Connor was convicted on two counts of distributing and aiding and abetting the distribution of cocaine. In support of these charges, the government introduced evidence that on July 17, 1998, when confidential informant Lowe went to the Good Fellows Bar to buy drugs, he went with Connor to a back room where Connor "informed" him that Billie Joe Fields, a dancer known as "Dixie," "was holding and had some [drugs] for sale." Lowe then purchased drugs from Fields and turned the purchased drugs over to a nearby FBI agent. The agent corroborated the transaction based on the movements of the individuals, although he did not actually hear the conversation between Connor and Lowe.

Evidence was also introduced that on January 6, 1999, confidential informant Lowe sought to retrieve cocaine that was owed to him by Robert Provo. Lowe testified that he was repaid the cocaine when Connor gave it to Provo to give it to Lowe. The testimony of "Dixie" Fields corroborated Lowe's testimony. She overheard a conversation between Connor and another individual about the same cocaine in which the individual requested buying cocaine from Connor and Connor stated that "he could not sell it because it [belonged to Provo]."

We are satisfied that the evidence introduced by the government demonstrated that Connor culpably participated in the drug transactions with which he was charged and had knowledge of the intended result of each transaction. *See United States v. Arrington*, 719 F.2d 701, 705 (4th Cir. 1983).

Dailey challenges his conviction for conspiracy to distribute methamphetamine, arguing that there was insufficient evidence to link him in any conspiracy with Saucier, Yates, or Felix. Yet Felix and John Courtney testified that Dailey was Saucier's "right hand man" in the drug distribution ring, even though Dailey and Saucier's relationship had not always remained smooth. Saucier testified that he provided Dailey with quarter-pound quantities of methamphetamine every two to three months. Gerald Penor buttressed this testimony by stating that he saw Dailey purchase methamphetamine from Saucier and that Penor then bought some from Dailey. Numerous other witnesses, including Steven Cooper, Ernest Soricelli, Reid Woodruff, and Jeremy Bruss testified that they purchased methamphetamine from Dailey. This evidence amply demonstrates Dailey's involvement in a distribution conspiracy in which Saucier sold large quantities of methamphetamine to Dailey who then distributed them in smaller quantities to others.

Dailey also contends that the evidence was insufficient to support his convictions for two charges of possession of methamphetamine with intent to distribute in 1996. On these counts, Jerry Lee Penor, Gerald Penor's son, provided the key testimony, stating that, beginning in February 1996, he went over to Saucier's house frequently and visited Dailey there. Jerry Lee saw methamphetamine there several times, including a "huge mound" of it on the floor at one point. Jerry Lee later saw Dailey package the methamphetamine and Jerry Lee delivered some of the drugs to Ratliff who paid Dailey directly. Although the dates of these transactions are not entirely precise, there was ample evidence that the transactions occurred substantially during the period alleged in the indictment.

Finally, Levenite challenges the sufficiency of evidence to support his conviction for possession of a firearm and explosive materials by a convicted felon. While he does not challenge the proof that he was a convicted felon and that the firearms in question traveled in interstate commerce, he challenges the sufficiency of the evidence demonstrating that he had possession of them. There was evidence, however, that Levenite was the "enforcer" for the Renegades and that, at times, he carried a 9 mm weapon. Karen Twiddy testified that Levenite kept a Walther PPK on his bedside table and also had an assault rifle. Mark Baker stated that he saw an SK-47 assault rifle at Levenite's house.

Kenneth Connor testified that he saw Levenite with a 9 mm gun, and Ernest Soricelli testified that he saw a "Street Sweeper" shotgun at Levenite's house. Confidential informant Lowe testified that he twice purchased weapons from Levenite, a .38 special Derringer and a Mossberg shotgun. Finally, during a search of Levenite's house conducted on February 24, 1999, the FBI seized a Walther PPK 7.65 caliber semi-automatic pistol, a 12-gauge Street Sweeper shotgun, a Mac-11 9 mm semi-automatic pistol, a Poly-Tech AKS 7.62 caliber semi-automatic assault rifle, over 700 rounds of ammunition, an offensive hand grenade, a grenade simulator, and four detonators. The evidence to support Levenite's conviction for possession of firearms and explosive materials was ample.

VI

Finally, Levenite contends that the district court erred in enhancing his sentence (1) by the number of firearms involved in his convictions, under U.S.S.G. § 2K2.1(b)(1)(C), and (2) by reason of a previous conviction, under U.S.S.G. § 4A1.1.

First, the district court enhanced Levenite's offense level by three levels because he was in possession of ten weapons, including four detonators. Levenite contends that a detonator is not a weapon that should enhance his sentence. We disagree.

The commentary to U.S.S.G. § 2K2.1 defines a firearm to include a "destructive device" and states that the definition of "destructive device" is found in 26 U.S.C. § 5845(a). *See* U.S.S.G. § 2K2.1, cmt. n.1, 4. Section 5845(f)(3) defines the term destructive device to include "any combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may be readily assembled. The term 'destructive device' shall not include any device which is neither designed nor redesigned for use as a weapon." We have held that in determining whether a device falls under this definition, the government must present evidence demonstrating that the defendant intended to use such components "as a weapon." *United States v. Blackwell*, 946 F.2d 1049, 1054 (4th Cir. 1991).

In this case, the government proved that Levenite was the "enforcer" for the Renegades Motorcycle Club, a function that did not

provide a legitimate reason or commercial purpose for the use of detonators. FBI special agent Thomas Mohnal testified that detonators are designed and manufactured to set off an explosive such as dynamite and that the four detonators in this case worked as they were designed. The government also presented evidence that the detonators were seized from Levenite's house along with other firearms and grenades. Although the evidence is circumstantial, we conclude that sufficient evidence supported the district court's conclusion that the sentence should be enhanced three levels based upon its finding that Levenite intended to use the detonators as weapons.

The district court also enhanced Levenite's sentence based on his 1984 Pennsylvania conviction for driving under the influence. Levenite was sentenced to a range of 2 days to 23 months for the conviction and served 2 days. He contends that this conviction does not fulfill the Sentencing Guidelines' requirement that the conviction be one for which the sentence of imprisonment exceeds one year and one month. Again, we disagree.

The district court applied U.S.S.G. § 4A1.1(a), which directs the district court to "[a]dd three points for each prior sentence of imprisonment exceeding one year and one month." The sentence of imprisonment referred to is the *maximum* sentence imposed, not the time actually served, *see id.* § 4A1.2(b) & cmt. n.2, as long as the defendant served some period of imprisonment, *id.* § 4A1.2 cmt. n.2.

Although Levenite served only 2 days for the conviction, the maximum sentence imposed was 23 months, fulfilling the Sentencing Guidelines' requirement for the enhancement.

For the foregoing reasons, the judgments of the district court are

*AFFIRMED.*