COMMONWEALTH *vs.* THADDEUS L. HUGHES.

No. 10-P-1423.

Berkshire. January 6, 2012. - June 21, 2012.

Present: GRAHAM, RUBIN, & MILKEY, JJ.

*Controlled Substances. Witness,* Fee. *Practice, Criminal,* Instructions to jury,
    Comment by prosecutor.

The judge at a criminal trial erred in declining to give the jury a specific
    instruction requested by the defendant that testimony from a witness who
    is paid by the government in return for her participation in the case should
    be subjected to a higher degree of scrutiny than testimony from other wit-
    nesses [24-29]; further, given that the prosecutor impermissibly suggested
    in closing argument that the jury could conclude that the Commonwealth's
    case was strong because the defendant had chosen to put on witnesses
    even though he had no obligation to do so, this court concluded that the
    combination of preserved and unpreserved error entitled the defendant to a
    new trial [29-31].

INDICTMENTS found and returned in the Superior Court Depart-
ment on March 28, 2008.

The cases were tried before *Daniel A. Ford,* J.

*Edward P. Mulvaney* for the defendant.

*Karen Carlo,* Assistant District Attorney, for the Com-
monwealth.

MILKEY, J. After a jury trial in the Superior Court, the defend-
ant was convicted on two indictments charging distribution of
cocaine, both as subsequent offenses. G. L. c. 94C, § 32A(*c*),
(*d*). On appeal, he asserts a variety of errors, including a claim
that the judge erred in declining to instruct the jury that the
testimony of a paid informant should be weighed with care, as
well as a claim that the prosecutor improperly commented on
the defendant's decision to exercise his right to present a defense.
We agree and conclude that the combination of these two errors
requires reversal of the defendant's convictions.

*Background.* At the center of this case is a police informant whom we shall refer to as Sherry Ross (a pseudonym). Ross testified that she was a drug addict and that she had smoked "crack" cocaine "thousands" of times. She had been arrested on numerous occasions, and she acknowledged that she would do "[j]ust about anything" to purchase her drugs. In her words, "I stole money from friends, family, people I didn't really know, lied, schemed to get money. At one point I was prostituting myself."

In 2006, the police began using Ross to make controlled purchases of drugs. In addition to providing her some clothes, food, and various incidentals such as cellular telephone "minutes," the police paid her money. If an attempted purchase was unsuccessful, the police paid Ross twenty dollars for her "time and effort." If the purchase was successful, she received at least forty dollars, but she got "paid more if the police arrested someone after [she] bought drugs." In that event, Ross would receive an "arrest payment" of up to $200. The police paid her over $1,000 in 2006. Although Ross worked for the police only two days during the first nine months of 2007, she worked steadily for the police during the remainder of that year.[1] According to Ross's testimony, the payments that she received from the police during these three months, which totaled more than $1,000, were her only source of income, and she spent this money on drugs. Ross continued to receive money from the police until "late 2009" (which was shortly before the January, 2010, trial in this case).

By December of 2007, the police had become aware that a residence at 158 Francis Avenue in Pittsfield was regularly used as a "crack house," a place where crack cocaine could be purchased and smoked. On December 4, 2007, and then again the following day, Ross executed two controlled purchases at this crack house. A police officer testified that at the time that Ross made these purchases, she had agreed to "buy testify," which meant that Ross "ma[d]e controlled buys . . . under the agreement that [she would] give a statement and later on, if necessary, . . . testify in court." In both the December 4 and 5

---

[1]Ross's return to working for the police was precipitated by her arrest on prostitution charges for soliciting an undercover police officer.

controlled purchases, the police took Ross to and from the building, supplied her with funds for the purchases, and thoroughly searched her before and after she went inside. Ross purchased a "rock" of crack cocaine on each occasion, and she told the police that the person who sold her the drugs was a dark-skinned black man whom she knew as "Boogs."[2] According to her trial testimony, Ross first met Boogs at the house some two weeks before the controlled purchases, and she purchased crack cocaine from him as many as forty times during those two weeks. On December 6, 2007 (the day after the second controlled purchase), the police showed Ross a photographic array and she selected the defendant's photograph as Boogs, the person who sold her the drugs. She similarly identified him at trial.

The defendant maintained that he lived in Springfield with his cousin and her family when the two controlled purchases were made. In an effort to demonstrate that he was in Springfield at the very time the drugs were sold, he presented his cousin and her son as alibi witnesses. The prosecutor sought to discredit these witnesses in various respects.[3] The prosecutor also elicited from them that the defendant had demonstrated ties to Pittsfield. Most significantly, during the relevant period, his children and their mother lived in Pittsfield on the same street as the crack house.

As defense counsel underscored in his closing argument, Ross provided "the only evidence that it was [the defendant] who sold her cocaine" inside the crack house. He urged the jury not to credit her testimony for various reasons including "her possible bias in wanting to please the police so she could continue

[2]Ross also testified that she described Boogs to the police as follows: "He had scruffy facial hair. He had little tight braids. He was — I don't remember exactly how tall I said. I gave them a general weight and description." There was no evidence (apart from skin color) that, at the relevant time, the defendant met the description that Ross gave to the police directly after she returned from the crack house. Nor was there any corroborating evidence that the defendant ever went by the nickname "Boogs."

[3]For example, after each of these witnesses testified that the defendant lived with them throughout the period from December, 2007, to December, 2008 (and never lived anywhere else during that period), one of the witnesses acknowledged on cross-examination that the defendant was in fact incarcerated for most of that time.

to work with them, so she could continue to receive money from them."[4]

The prosecutor also focused on Ross in his closing argument. He portrayed her as a victim of drug abuse whose credibility was bolstered by her freely admitting the various unsavory aspects of her life. At one point in his closing argument, the prosecutor emphasized that the defendant had no obligation to present evidence in his defense. He then went on to make the following comments on the defendant's decision to call witnesses: "If my case was so bad, he could have sat back and said: Go ahead, come, prove your case. . . . They are telling you that [Ross] is not believable. But he went ahead and put on witnesses." The defendant made no objection at trial to this aspect of the closing argument.[5]

Although the prosecutor at one point referenced some of the benefits that Ross received, he urged the jury to believe Ross because she was an "independent eye witness" who was not "working for . . . the police" and who "wasn't trying to get anything from the police." He contrasted her status with that of the alibi witnesses, whom he characterized as family members with an incentive to cover for the defendant. The defendant did not object to this. However, the defendant did request that the judge instruct the jury that they should use "greater care" in evaluating the testimony of any witnesses who were receiving "promises, rewards or inducements" in return for their testimony. The judge declined to do so, concluding that "[p]romises, rewards and inducements" were instead the province of argument. After the judge charged the jury without giving the requested instruction, the defendant objected on this basis.[6]

*Discussion.* 1. *Jury instruction.* As the record in this case

[4]Defense counsel added that Ross might not be lying but might simply be "honestly mistaken" (in part because of her active use of drugs during this period).

[5]The defendant did object that portions of the closing argument improperly sought to elicit sympathy for Ross, an issue he continues to press on appeal. We need not reach this argument given that we are reversing on other grounds.

[6]The judge did instruct the jury generally about their role in assessing witness credibility, and he highlighted that the Commonwealth's burden of proving each element of the crimes "specifically includes the burden of proving beyond a reasonable doubt the identity of the Defendant as the perpetrator of the crimes with which he stands charged." With regard to issues of potential

well documents, informants who are paid to make controlled purchases play an important role in the ability of the police to infiltrate the drug underworld. The dispute before us regarding the potential bias of such witnesses is a narrow one. The fact that these witnesses receive some compensation does not mean that their testimony is necessarily unreliable, and the defendant makes no argument that Ross should have been disqualified as a witness. Conversely, the Commonwealth acknowledges, as it must, that it was fair play for the defendant to argue that Ross's testimony might have been skewed by the financial benefits that she received. The narrow question before us is whether the defendant was entitled to a specific jury instruction that testimony from a witness who is paid by the government in return for her participation in the case should be subjected to a higher degree of scrutiny than testimony from other witnesses. We begin by reviewing two of the cases on which the defendant relies: *Commonwealth* v. *Luna*, 410 Mass. 131 (1991), and *Commonwealth* v. *Miranda*, 458 Mass. 100 (2010), cert. denied, 132 S. Ct. 548 (2011).[7]

*Luna, supra* at 138, involved an informant who was interested in obtaining a "finder's fee" in the event that an alleged drug dealer's house was forfeited in a pending Federal proceeding. At trial, "[d]efense counsel fully developed the possibility that [the informant] named [the defendant] as the seller of the drugs in order to receive a reward from the sale of [the defendant's] forfeited house." *Id.* at 138-139. The defendant there did not request a specific jury instruction on the issue, and the court held that the absence of one did not create a substantial risk of a miscarriage of justice. *Id.* at 140. However, the court declared that "[i]n the future, a specific instruction that the jury weigh such a witness's testimony with care should be given on request." *Ibid.*

---

bias, the judge instructed only that the jury could "consider the appearance of the witness here at trial as well as any bias that he or she may have shown in deciding what credit to give to his or her testimony." Compare Criminal Model Jury Instructions for Use in the District Court, Instruction 2.260 (2009) ("You may also consider his motive for testifying, whether he displays any bias in testifying, and whether or not he has any interest in the outcome of the case").

[7]*Miranda* was issued after the trial in this case, so the trial judge did not have the benefit of its teachings.

We turn next to *Miranda*, the Supreme Judicial Court's recent pronouncement on the subject. In *Miranda, supra* at 105, a local chamber of commerce had established a reward program under which it "would pay $3,000 for information that helped lead to an indictment in an unsolved homicide, and an additional $2,000 if the information provided led to a conviction." On appeal, the defendant claimed that his Federal and State due process rights were violated "because two witnesses at trial were paid consideration for their testimony contingent on his conviction." *Id.* at 101. The court rejected this claim, and it affirmed the convictions. *Id.* at 108-111. However, critical to the court's analysis was the existence of certain procedural safeguards, including that the judge "instruct[ed] the jury about the heightened scrutiny to be given testimony provided under a fee payment arrangement." *Id.* at 109, quoting from *United States* v. *Levenite*, 277 F.3d 454, 462 (4th Cir.), cert. denied, 535 U.S. 1105 (2002).[8] After recognizing that Federal courts have required such safeguards even where the payment to the witness was not contingent on the outcome of the case,[9] the Supreme Judicial Court expressly "adopt[ed] the Federal procedural safeguards." *Miranda, supra* at 109-110.[10]

On various grounds, the Commonwealth argues that the directives contained in *Luna* and *Miranda* do not apply here. First, it

[8]The four procedural safeguards outlined in *Levenite* and adopted in *Miranda* are (1) disclosure of the payment arrangement to the defendant against whom the witness will testify before the proceeding at which the testimony occurs; (2) a full opportunity for the defendant to cross-examine the witness about the fee arrangement; (3) a jury instruction about "the heightened scrutiny to be given testimony provided under a fee payment arrangement"; and (4) "there can be no indication that the government is sponsoring or suborning perjury." *Miranda, supra* at 109, quoting from *Levenite, supra* at 462. The other three safeguards were satisfied in this case.

[9]Contrast *United States* v. *Cook*, 102 F.3d 249, 253 (7th Cir. 1996) (where witness received $3,500 for his role in investigation, court concluded that "[g]iven the pervasiveness of reliability problems, [the court] thinks it adequate, in the main, to give a general credibility instruction referring to the possibility of bias, which coupled with cross-examination and closing argument by counsel will put the subject before the jury for decision"); *id.* at 255 (Ripple, J., concurring) (noting that although "[m]ost other circuits treat informant and accomplice instructions as generally advisable and prudent . . . the failure to give the instructions is not automatic error"), and cases cited.

[10]Contrast *Commonwealth* v. *Daye*, 411 Mass. 719, 738-740 (1992) (where witness testified that, in exchange for truthful testimony, she would be kept in

argues that Ross was compensated solely for working with the police and that Ross did not receive compensation to testify at trial. But that claim is inconsistent with the record. As noted above, a police officer who worked with Ross testified that informants in Ross's position will "buy testify," which means that they "will make controlled buys . . . under the agreement that they will give a statement and later on, if necessary, they will testify in court." Further, the same officer testified, in reference to the time period during which Ross purchased drugs from the defendant, that Ross "had agreed to buy testify." Thus, the agreement between Ross and the police included a provision that Ross testify if necessary.

Next the Commonwealth argues that, at the time they testified, the witnesses in *Luna* and *Miranda* stood to gain financial benefits, while here the compensation was all in the past. It is certainly true that by the time she testified, Ross was no longer working for the police, her identity had been revealed, and she had received all of the compensation she could have anticipated. Nevertheless, we do not agree with the Commonwealth that the only source of potential bias here can be discounted as mere "gratitude for past favors." At the time Ross identified the defendant to the police, she faced a real incentive to supply information that would lead to an arrest (since she received a larger payment if that transpired).[11] Once Ross identified someone, she might feel locked into that identification even if she stood to gain no additional compensation. Notably, if someone in such a position changed her story, she might face criminal sanctions as a result. See, e.g., *Commonwealth* v. *Costa*, 448 Mass. 510, 516 & n.10 (2007) (identified informants are more reliable because they are subject to prosecution under G. L.

protective custody, receive treatment for drug addiction, and not be prosecuted for her involvement in crimes, trial judge was not required to give instruction that jury should take great care in evaluating testimony of witness whom prosecutor had promised not to prosecute).

[11]Although the individual amounts Ross received remained overall relatively small, such payments must be viewed in context: they were her only source of available income to feed her addiction during the three-month period that encompassed the underlying controlled purchases. At the same time, it bears noting that the economic incentives she faced did not necessarily cut in favor of her misidentifying the seller. In fact, an accurate identification of a seller might well provide the surest path to an arrest.

c. 269, § 13A, for making a false report of a crime). In addition, the court in *Miranda*, 458 Mass. at 109-110, plainly expressed its view that the various procedural safeguards are required even if the compensation at issue is not conditioned on a conviction. A witness who is to be paid regardless whether there is a conviction is in a structurally similar position to one who has already been paid for her role in identifying a perpetrator.

We do not mean to suggest that the incentives Ross faced were as direct as those faced by the witnesses in *Luna* and *Miranda*. However, based on what the Supreme Judicial Court said in those cases, we conclude that someone in Ross's position falls within the purview of the directives issued there. Accordingly, absent further direction from the Supreme Judicial Court, we conclude that the defendant was entitled to an instruction that when a witness's testimony results from a fee arrangement with the government, that testimony must be weighed with particular care.[12] The defendant not only specifically requested an instruction along these lines, he objected to its absence when one was not given. The claim of error was therefore unquestionably preserved, and the prejudicial error standard of review applies. See *Commonwealth* v. *Vick*, 454 Mass. 418, 423 n.5 (2009). Given that the Commonwealth's case turned on whether the jury credited Ross's identification testimony, it

---

[12]An example of such an instruction can be found in *Levenite*, from which the *Miranda* court adopted the relevant procedural safeguards. In *Levenite*, 277 F.3d at 460, the trial judge had instructed the jury as follows:

"You have heard testimony from paid informants who were employed by the Government to investigate the defendants. The fact that an individual is a paid informant does not disqualify him as a witness. The uncorroborated testimony of a paid informant may be a sufficient basis for a finding of guilt if you believe beyond a reasonable doubt that such testimony is both credible and of sufficient weight. It is neither illegal nor improper to utilize paid informants in the enforcement of the criminal laws. However, the testimony of a paid informant must be subjected to a higher degree of scrutiny as to both weight and credibility. This is true because you must decide if such a witness has a greater motive to testify truthfully or falsely."

We do not mean to suggest that this precise instruction is required in cases involving paid informants. We include it only as an example of an even-handed instruction that draws the jury's attention to the issue without casting undue aspersion on the use of paid informants as witnesses.

becomes difficult to say with assurance that the error "did not influence the jury, or had but very slight effect."[13] *Ibid.*, quoting from *Commonwealth* v. *Stuckich*, 450 Mass. 449, 453 (2008). However, we need not decide whether the absence of the requested instruction by itself would entitle the defendant to a new trial, because there was a second error at trial to which we now turn.[14] See *Commonwealth* v. *Andujar*, 57 Mass. App. Ct. 529, 532-533, 537 (2003) (although a certain error "[s]tanding alone . . . might well fall within the ambit of cases where such an error was deemed harmless or nonprejudicial," that error "appears synergistically toxic when viewed in conjunction with the prosecutor's" comment on the defendant's silence at the time of his arrest).

2. *Comment on the defendant's offer of evidence.* As noted, the prosecutor suggested in his closing argument that the jury could conclude that the Commonwealth's case was strong, because the defendant chose to put on witnesses even though he had no obligation to do so. In defending this comment on appeal, the Commonwealth points to the fact that existing case law addresses only a prosecutor's commenting on a defendant's choice not to put on a case, not on his choice to do so. See, e.g., *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987) (noting that "a prosecutor should not refer to the defendant's failure to testify"). In our view, this distinction does not make a difference. "The right to offer the testimony of witnesses . . . is in plain terms the right to present a defense, the right to

---

[13]We note that while defense counsel effectively developed the record regarding Ross's potential bias through cross-examination, he — for whatever reason — did little to press the issue in his closing argument. Also notable is the limited nature of the instruction that the judge gave generally on motive and bias. See note 6, *supra*.

[14]The instant case is distinguishable from *Commonwealth* v. *Molina*, 81 Mass. App. Ct. 855 (2012). The instruction given by the judge in that case, *id.* at 859, unlike that provided in this case, did specifically bring to the jury's attention the relevance of the witness's motive for testifying. Although the instruction from *Molina* was not as extensive as either the instruction later indorsed by *Miranda* or the one requested by the defendant in this case, the defendant in *Molina* did not object to the instruction given. Our review in that case was thus limited to whether any deficiency in the instruction had created a substantial risk of a miscarriage of justice. By contrast, the defendant here requested the necessary instruction and properly objected to its absence; thus, we apply the prejudicial error standard of review.

present the defendant's version of the facts as well as the prosecution's to the jury so [they] may decide where the truth lies." *Washington* v. *Texas*, 388 U.S. 14, 19 (1967). This right is secured by the Sixth Amendment to the United States Constitution and by art. 12 of the Massachusetts Declaration of Rights, and "[f]ew rights are more fundamental" to the due process of law. *Chambers* v. *Mississippi*, 410 U.S. 284, 302 (1973). It was plain error for the prosecutor to disparage, or to invite the jury to draw an adverse inference from, the mere exercise of such a fundamental right. Compare *Doyle* v. *Ohio*, 426 U.S. 610, 617-619 (1976) (commenting on defendant's postarrest silence); *United States* v. *Daoud*, 741 F.2d 478, 480 (1st Cir. 1984) (commenting on defendant's requests for counsel); *Commonwealth* v. *Gouveia*, 371 Mass. 566, 571 (1976) (commenting on defendant's failure to testify); *Commonwealth* v. *Person*, 400 Mass. 136, 138-143 (1987) (commenting on defendant's decision to present his side of story only after hearing evidence against him); *Commonwealth* v. *Beauchamp*, 424 Mass. 682, 690-691 (1997) (commenting on defendant's discussions with attorney); *Commonwealth* v. *Ewing*, 67 Mass. App. Ct. 531, 541-542 (2006), *S.C.*, 449 Mass. 1035 (2007) (commenting on defendant's right to discovery and to prepare for trial).

The prosecutor made his remark about the defendant's case presentation with specific reference to Ross's credibility. It thus added to the prejudice effected by the absence of a jury instruction. We conclude that the combination of preserved and unpreserved errors entitles the defendant to a new trial.[15] Compare *Andujar*, 57 Mass. App. Ct. at 537 (impermissible comment on

---

[15]There is no merit to the defendant's argument that the Commonwealth presented insufficient evidence that he had previously been convicted of the same violation during the subsequent offender portion of the case. Here, the Commonwealth demonstrated not only that an individual with the same unusual name had been convicted of possession with intent to distribute, but also that the defendant shared the same birth date as that person. In addition, there was other evidence, such as the defendant's admission to a probation officer that he had a prior conviction for a drug offense. This is far from a case where the Commonwealth simply "introduced three 'packets' of court documents" to prove a subsequent offender violation. See *Commonwealth* v. *Koney*, 421 Mass. 295, 301 (1995).

Given our disposition, we need not address the defendant's remaining claims of error.

defendant's right to remain silent, even though not preserved, warranted reversal when taken together with preserved error).

*Judgments reversed.*

*Verdicts set aside.*