## COMMONWEALTH *vs.* ALEXANDER MOLINA.

No. 10-P-392.

Bristol. October 14, 2011. - June 13, 2012.

Present: MILLS, KATZMANN, & MILKEY, JJ.

Further appellate review granted, 463 Mass. 1112 (2012).

*Homicide. Witness,* Fee, Credibility. *Constitutional Law,* Admissions and confessions, Voluntariness of statement. *Evidence,* Admissions and confessions, Voluntariness of statement. *Practice, Criminal,* Admissions and confessions, Voluntariness of statement, Instructions to jury.

At a criminal trial in which one witness received a cash reward from a local chamber of commerce for testifying, the judge's instruction to the jury, which alerted the jury to the issues of motive, bias, and possible interest in the outcome of the case, was largely to the same effect as the one that should have been given (namely, that the jury weigh with particular care testimony by a witness receiving a reward), and to the extent that it fell short, the defendant did not preserve the issue and there was no substantial risk of a miscarriage of justice. [857-860]

A Superior Court judge did not err in denying a criminal defendant's pretrial motion to suppress statements that he made to police during questioning at the police station, in which the defendant claimed that he had invoked his right to counsel, where, even if the interview had been custodial, none of the defendant's statements was the kind of unequivocal invocation of the right as to require the officers to stop questioning. [865-868]

There was no merit to a criminal defendant's argument that he was entitled to an instruction at trial on honest but mistaken identification. [868]

INDICTMENTS found and returned in the Superior Court Department on July 21, 2005.

A pretrial motion to suppress evidence was heard by *David A. McLaughlin,* J., and the cases were tried before *Richard T. Moses,* J.

*David Keighley* for the defendant.

*David J. Gold,* Assistant District Attorney, for the Commonwealth.

MILLS, J. A jury convicted the defendant of murder in the second degree, G. L. c. 265, § 1, and two firearm violations,

G. L. c. 269, §§ 10(*a*) and 12E. He argues on appeal (a) a violation of *Commonwealth* v. *Miranda*, 458 Mass. 100, 105-113 (2010), cert. denied, 132 S. Ct. 548 (2011), concerning a cash reward to a witness; (b) improper denial of his motion to suppress statements made to the police; and (c) insufficient instruction with respect to "honest but mistaken identification." We affirm.

*Background.* James Gauoette (victim) was shot and killed in New Bedford on March 30, 2005, during daylight. Three people saw the events surrounding the shooting. We refer to them by pseudonyms as Alice, Barbara, and Claire. Their testimony, although differing in some details, was consistent in part. Alice testified that she heard gunfire, saw the victim lying on the sidewalk, and observed a man with a short-sleeve, mustard colored T-shirt and light colored jeans standing over the victim, hitting him with an object. That man was of medium build with a tanned complexion, but she could not see his face. He ran down Salisbury Street.

Barbara, who was acquainted with the defendant, testified that she was talking with him around 5:00 P.M. on a porch in the vicinity of the shooting. He was wearing jeans and a yellow shirt. She observed "Jimmy" (the victim) approach the defendant, saying, "I'm just here to talk." She saw the defendant go to the trunk of his car, which was parked nearby, retrieve a gun, and shoot Jimmy. Barbara saw the defendant ten to fifteen minutes later, after police and medical personnel had arrived, but he had changed into a brown jogging outfit.

Claire testified that she heard a gunshot and, looking out of her window, saw a man walk across Salisbury Street to the corner of Ruth and Salisbury Streets and shoot the "kid" lying on the sidewalk four times before running back across the street and giving the gun to another man, who threw it inside a green car parked on Salisbury Street.

Claire knew the green car to have been previously driven by the defendant, whom she knew from the neighborhood. She saw the shooter and his friends running away and, some twenty or thirty minutes later, saw the shooter come up Salisbury Street and go into a beige house, emerging in different clothing, having

changed to a brown sweatshirt. Claire identified the defendant in court as the shooter.

At the police station, the defendant was described as wearing a brown corduroy or velour suit. Other trial testimony, principally from police witnesses, and findings by the judge on the motion to suppress will be related as necessary to our discussion of the issues.

*Discussion.* 1. *Cash reward to Claire.* In *Commonwealth* v. *Miranda*, 458 Mass. at 105-113, decided after the trial in this case, the Supreme Judicial Court addressed, for the first time, the receipt of cash rewards by witnesses. There two witnesses had received cash rewards from the New Bedford Chamber of Commerce (chamber of commerce), which had established a cash reward program intended to assist in the resolution of unsolved homicide cases. *Id.* at 100-102, 105-106. In this case Claire received a cash reward from the very same program.

In *Commonwealth* v. *Miranda, supra* at 112, the court, exercising its superintendence authority, prospectively forbade a prosecutor's participation in a cash reward scheme — a directive not at issue in this case. The court, *id.* at 109, also adopted the four procedural safeguards set forth in *United States* v. *Levenite*, 277 F.3d 454, 462 (4th Cir.), cert. denied, 535 U.S. 1105 (2002), which we include in the margin.[1] In this case, the second and fourth standards are clearly satisfied: defense counsel conducted a thorough cross-examination of the witness, and there is no evidence that the Commonwealth was sponsoring or suborning perjury. The asserted absence of the other two safeguards, pretrial disclosure and a "heightened scrutiny" instruction, form the basis of the defendant's request for a new trial.

First, as to the nondisclosure, we summarize the circum-

---

[1] "First, a witness-fee payment arrangement must be disclosed to each defendant against whom the witness will testify before the proceeding at which the witness testifies . . . . Second, the defendant must be afforded an opportunity to cross-examine the witness about the fee arrangement. Third, the court must instruct the jury about the heightened scrutiny to be given testimony provided under a fee payment arrangement. . . . And finally, there can be no indication that the government is sponsoring or suborning perjury."

*Commonwealth* v. *Miranda, supra,* quoting from *United States* v. *Levenite, supra.*

stances. On the second day of trial, after the recross-examination of Claire, the prosecutor requested a sidebar noting Claire's participation in the reward program and expressing concern that Claire had not been examined with respect to it. It is obvious from the record that the Commonwealth sent, or intended to send, pretrial notice and that through inadvertence or otherwise, with no evidence of subterfuge, the defendant's attorney had not received it. Counsel and the judge examined at sidebar a similar or identical letter, from a similar arrangement in another case. Between the judge and the attorneys, a solution was proposed: the witness would be examined as to the reward arrangement (and she was), and the attorneys agreed to a stipulation as to Claire's eligibility for a further reward. Days later, again at sidebar, defense counsel represented that the chamber of commerce issue had been "put to bed or to rest," that he was satisfied with the information that he obtained, and that the court need not address it further.

The defendant argues on appeal that, because *Commonwealth v. Miranda* had not yet been decided, trial counsel could not have validly waived claims arising out of that decision, including the possible failure to disclose the reward as a prong of the due process safeguards adopted in *Commonwealth v. Miranda*, 458 Mass. at 109. However, the duty to disclose a reward was not a new duty created by *Commonwealth v. Miranda*. Pursuant to rule 14 of the Massachusetts Rules of Criminal Procedure, a prosecutor must disclose "all promises, rewards or inducements made to witnesses the party intends to present at trial." Mass. R.Crim.P. 14(a)(1)(A)(ix), as amended, 444 Mass. 1501 (2005). Thus, when the defendant's counsel reached an agreement with the trial prosecutor about how to handle the delayed disclosure and pronounced himself content with the arrangement, he was alert to the fact that he was waiving a potential claim. Surely he could have requested relief (for example, a mistrial or continuance), but he elected to proceed with the trial already underway and to craft a remedy in commendable cooperation with the trial prosecutor.

The second safeguard that the defendant claims is not present here is the instruction that the jury weigh with particular care testimony by a witness receiving a reward. In *Commonwealth v.*

*Miranda, supra* at 110-111, when each witness receiving a reward testified, the judge instructed the jury "to scrutinize the testimony with 'particular care' because the reward was 'contingent on there being a guilty verdict.' " In addition, the judge repeated this instruction in her final charge to the jury. *Id.* at 111. The court declared that this satisfied the requirement that "the court must instruct the jury about the heightened scrutiny to be given testimony provided under a fee payment arrangement." *Id.* at 109, quoting from *United States* v. *Levenite, supra* at 462. However, that the particular instruction in *Commonwealth* v. *Miranda* was satisfactory does not mean that it represents a minimum level of instruction necessary to meet the requirement.

Here, while the judge gave no instruction immediately following Claire's testimony, the judge did reference the issue in the final charge pursuant to defense counsel's request. At the end of the standard instruction on witness credibility, the judge added:

> "In addition, you may also consider a witness's motive for testifying and whether they display any bias in testifying and whether the witness has an interest in the outcome of the case."

While this instruction does not specifically reference the chamber of commerce reward program, the jury would have been alerted to its relevance to the program because they had heard testimony about the receipt of the reward earlier in the trial and had just been reminded of it in the defense counsel's closing argument.

The instruction may not be as extensive as the instruction given in *Commonwealth* v. *Miranda*, 458 Mass. at 109, but it does go to the same basic premise that the Supreme Judicial Court addressed when it required that the jury be instructed to give "heightened scrutiny." We view the instruction here generously, inasmuch as the trial preceded the opinion in *Commonwealth* v. *Miranda*. Cf. *Commonwealth* v. *Collins*, 374 Mass. 596, 599 (1978) (notwithstanding retroactive effect of new constitutional rule on jury instruction language, Supreme

Judicial Court as matter of State practice will give "more careful scrutiny" to jury instructions following date of opinion).

Jury instructions are not required to use specific words as long as the ideas are adequately conveyed. *Commonwealth* v. *Deane*, 458 Mass. 43, 58-59 (2010), citing *Commonwealth* v. *Sherry*, 386 Mass. 682, 696-697 (1982). Although the instruction does not expressly require the jury to view the testimony of a compensated witness with heightened scrutiny, the instruction does alert the jury to the issues of motive, bias, and possible interest in the outcome of the case. The natural result of the instruction is that the jurors receiving it would scrutinize more closely the testimony of any witness with an interest in the outcome of the case. The instruction given was largely to the same effect as the one that should have been given, and to the extent it fell short, the defendant did not preserve the issue and there was not a substantial risk of a miscarriage of justice.

2. *The motion to suppress.* The defendant moved to suppress his statements to police made during three hours of questioning. The judge heard testimony from two witnesses and reviewed two videotapes, with a bilingual transcript, of approximately three hours of the defendant's questioning by police. The judge denied the motion. We review his findings, based upon live testimony, with the familiar deferential standard. We take an independent view of the facts based upon documentary evidence (the videotapes and bilingual transcript), without deference to the fact finder. See *Commonwealth* v. *Hoyt*, 461 Mass. 143, 148 (2011) (*Hoyt*).

a. *Findings based upon testimony.* The shooting of the victim occurred at approximately 5:00 P.M. on March 30, 2005. New Bedford police Officer David Brown arrived, observed officials and emergency personnel, and saw the victim lying in his blood. Brown observed the defendant (with whom he had some acquaintance) talking with a State trooper. New Bedford police Detective Christopher J. Dumont was nearby as a vehicle was being prepared for towing. The defendant acknowledged Brown's presence. Brown was unaware of any criminal background of the defendant and knew him as "Alex." They quickly exchanged pleasantries.

The defendant agreed to go to the police station for questioning. He was transported by Brown in the back seat of a

police cruiser. The doors were locked. No handcuffs were used. At the station Brown and the defendant went into an interview room, eight feet by twelve feet, where they spent forty-five minutes together. Brown did not know why the defendant was to be questioned.

At the station, the defendant was questioned by Detective Dumont and State Trooper Carmelo Serrano, who speaks Spanish as his primary language, as does the defendant.[2] The defendant was administered the Miranda warnings by being presented with a copy in the Spanish language. The defendant read the contents out loud and signed an acknowledgment that he had received the warnings and wished to speak with the officers. The defendant did not read out loud the section concerning telephone rights, including the right to contact an attorney by telephone. There is no signature that acknowledges receiving that information.[3] The defendant believed that the purpose of his visit to the station was to recover his car.

After the three hours of questioning concluded, the defendant was not arrested, and he was transported, at his request, back to the neighborhood in the vicinity of the shooting.

b. *Findings based upon documentary evidence.* In addition to reviewing the judge's findings without deference, we have independently reviewed the videotapes, assisted by the bilingual transcript.

Present at the interrogation were Trooper Serrano, Detective Dumont, and the defendant. The trooper conducted the interrogation. At times he would, in summary form, advise the detective of the defendant's responses. The detective, on a limited number of occasions, suggested lines of inquiry to the trooper. The interview commenced with the trooper asking the defendant if he could read Spanish. After the defendant said that he could, the trooper read the Miranda warnings out loud, from a form, and the following colloquy took place.

---

[2]Earlier that day Dumont had spoken with the defendant in a home near the scene of the shooting, at which time the defendant identified himself as Orlando Figueroa (not his true name). Dumont helped to arrange towing of the vehicle from the scene of the shooting. The vehicle was registered to the defendant as the owner.

[3]The parties have not supplied a copy of the "rights form" (exhibit 4 at the suppression hearing).

Commonwealth *v.* Molina.

SERRANO:        "OK. Do you understand your rights?"

DEFENDANT:     "Uh-huh, but I just said if I could call my attorney and I was told that it wasn't necessary; that I was coming just to be asked some questions . . . ."

SERRANO:        "Uh-huh."

DEFENDANT:     "And that I just went to . . . I was sleeping and I get a call that my car was being taken, and when I go there and I am told that I have to come here, that someone wants to ask me some questions . . . . I don't know what happened because I truly don't know . . . , my car was there because it was getting me music equipment."

SERRANO:        "OK, before . . . , do you, do you want to speak with me now . . . I want to ask you some questions; do you want to speak with me now during this time?"

SERRANO:        "You understand your rights no?"

DEFENDANT:     "Uh-huh, yes I understand."

SERRANO:        "Having understood your rights, you want to speak with me now?"

DEFENDANT:     "Whatever you say."

SERRANO:        "OK, then if you please sign here; this is just that you were advised of your rights and that . . . , you wish to speak with me now."

DEFENDANT:     "[T]hat is not that I am a witness for the town hall . . . , I have no problem."

SERRANO:        "[A]nd, Detective Dumont, could you please sign . . . ."

The initial segment of the interrogation dealt with the defendant's car and his claim that he was installing sound equipment

in it at about the time of the incident. The defendant also answered questions about his girlfriends and his work at a fish pier. After the defendant had stated that he had been in Boston and arrived in New Bedford at about 5:00 A.M., the trooper repeated that response in English, obviously for the benefit of the detective. The defendant then inquired, "May I ask you a question?" The trooper paid no attention and continued to advise the detective of the defendant's responses. The defendant again said, "Isn't it. I don't understand why am I being asked all these questions cause no . . . ." Again, neither officer responded and the questioning continued.

The next section of the conversation dealt with the defendant's exchange of pleasantries in the area of the shooting with an officer, presumably Officer Brown, and with the installation of speakers in the defendant's car. The questioning then became more focused, especially with regard to the defendant's activities at or about the time of the shooting, the identity of his girlfriends, and what clothing he had been wearing that day. When asked to identify a person, the defendant stated:

DEFENDANT: "Is it mandatory that I mention a name? Because if I . . . truly, if I had known that this would be like this, I honestly would have brought an attorney because I truly don't even know what has happened; I haven't been informed of what has happened and I am being questioned about, really, I mean, it's like my rights are being violated because I am being questioned on something that I truly don't know . . . . I mean because . . . ."

SERRANO: "We are, we are asking you questions because you already, you must know by now that a guy got shot over there."

SERRANO: "I tell you from the heart."

DEFENDANT: "Listen, I'm going to tell you something OK?"

SERRANO: "We, in here, we are grown up men . . . ."

DEFENDANT:     "Uh-huh."

SERRANO:       "That is . . . we are already mature men OK?"

DEFENDANT:     "Uh-huh, I know."

SERRANO:       "And I already, I'm asking you questions and you have to think."

DEFENDANT:     "Uh-huh."

SERRANO:       "That some of the questions that I am asking you, I already, I already know the answers, so, you have lied to me once because I asked you about the clothes and, already, if I, if, if I don't . . . mention about the yellow shirt, you wouldn't have told me anything about it."

DEFENDANT:     "Because, that's why, because I . . . that is, my mind is focusing in the car, my mind is not thinking whether I took off my clothes, whether this or that, you know? My mind is on the car."

SERRANO:       "But we are just, we are, we are just . . . ."

DEFENDANT:     "I'm sorry if I lied to you but you know, I did not intend to do so."

SERRANO:       "Ok then, then . . . we are trying . . . ."

DEFENDANT:     "Uh-huh."

SERRANO:       "We are investigating, so if you go and . . . if you start lying to me . . . ."

DEFENDANT:     "Uh-huh."

SERRANO:       "[T]hen the one who is going to look suspicious is going to be you right?"

DEFENDANT:     "Yes, I understand, I understand I am sorry."

SERRANO:        "Because when I ask you questions then be honest with me . . . ."

DEFENDANT:      "Uh-huh."

SERRANO:        "[T]hat way . . . there is no suspicion . . . there's not . . . you know what I mean?"

When the questioning focused on what clothing the defendant was wearing at what time during the day, the defendant interjected, "Honestly officer, you just tell me clearly if I need an attorney or something because, really, I don't know what's happening nor do I know what do I have to do with this." The trooper, after completing a sentence to the detective, responded to the defendant, "You . . . , uh. Uh if you, y . . . y . . . you, if . . . of, of, you need an attorney that is, that is up to you, if you want an attorney that is, is . . . ." The interrogation then switched, and the defendant was asked about disputes with other persons and his activities at the time of the shooting. The defendant was caught giving conflicting information about his name and that of his father. The defendant stated that when asked if he was Alex, he said "yes."

The last third of the interview became confrontational. The defendant denied being at the scene, and the police claimed that they had a witness to the contrary. Finally, the police claimed that witnesses had reported the defendant had a problem with the victim over a woman. The officers asserted that the defendant was lying and that there was evidence that the defendant had a gun in his hands.

c. *Invocation of the Fifth Amendment right to counsel.* The defendant sought suppression of his statement to the police on the grounds that he had invoked his right to counsel under the Fifth Amendment to the United States Constitution, notwithstanding that he had earlier received his Miranda warnings. As the judge correctly noted, the right to counsel does not attach until the interrogation becomes custodial. *Commonwealth* v. *Groome*, 435 Mass. 201, 216 (2001). Because the judge concluded that the interview did not become custodial until after any mention by the defendant of the word "attorney," the judge did not analyze whether the statements were sufficient to invoke the

right to counsel. This argument has substantial force.[4] However, as we will further discuss, even if the interview was custodial, none of the defendant's statements, in context, was the kind of unequivocal invocation of the right as to require the officers to stop questioning. Compare *Hoyt*, 461 Mass. at 150-154.

"In deciding whether a defendant has invoked the Fifth Amendment right to counsel, the United States Supreme Court has stated that 'after a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.' *Davis* v. *United States*, 512 U.S. 452, 461 (1994) (*Davis*). This post-waiver test requires that the invocation be a sufficiently clear statement such 'that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' " *Hoyt, supra* at 149-150, quoting from *Davis, supra* at 459. Here, as in *Hoyt*, the defendant maintains that he unambiguously invoked his right to counsel such that a reasonable police officer would understand the statement to be a request for an attorney. We disagree.

The defendant points to two mentions of an attorney that, he argues, in combination produce an unequivocal invocation of counsel. We have previously narrated the two references, *supra* at 863 and 865. The first mention, at the preliminary stage of Miranda warnings, *supra* at 863, functioned more as a request for clarification about the nature of the questioning and the

---

[4]The interrogation, which commenced at 11:46 P.M. and concluded at approximately 3:15 A.M., had distinct phases. Initially, the questioning was conversational; the defendant appeared to be, in the circumstances, relaxed and talkative, and he answered questions appropriately. About forty minutes into the interrogation, the inquiry began to focus on the defendant's activities that day and the clothing he was wearing. Nevertheless, the tone of questioning remained nonconfrontational with little change in demeanor of the parties, even after the trooper implied that the defendant was not being truthful.

Finally, after a fifteen-minute break, about two hours into the interrogation, the questioning became confrontational. Trooper Serrano conducted the questioning while standing no more than two feet from the seated defendant. The trooper raised his voice and interrupted the defendant's responses. When the defendant denied being at the scene, the police claimed they had a witness to the contrary and asserted that the defendant was lying and that there was evidence he had had a gun in his hands. Certainly at this point the coercive environment within the small interview room evidenced a custodial interrogation. See *Commonwealth* v. *Sneed*, 440 Mass. 216, 220 (2003).

statement he was about to give than as an unequivocal request for counsel. Indeed, the trooper asked whether the defendant understood his rights and wanted to speak, and as shown above, the defendant responded affirmatively. We conclude that no reasonable officer would have construed Molina's statement as an unequivocal request for counsel.

The later mention of counsel, *supra* at 865, was in the context of a reluctance to name the other individuals who had been with him that evening. The defendant was stalling because he did not want to answer the questions by naming other individuals who were near the scene. Although he mentioned an attorney, he did not request one going forward. He said that he would have brought an attorney. The passage reads as though the defendant was using the specter of his rights as a way to control the interview: not asserting the rights, but mentioning them in order to avoid specific questions that he did not want to answer. In context, and even in combination, these references to counsel do not give rise to an unequivocal invocation of the right to counsel.

When a suspect asks police whether he needs an attorney, the question may not constitute an unequivocal invocation of the right to counsel. In contrast, in *Hoyt*, 461 Mass. at 144, the defendant, during custodial interrogation after being given Miranda warnings, told police, "I'd like an attorney present. I mean I can't afford one. So I guess I'll speak to you now. I don't have an attorney." The court concluded that Hoyt had unambiguously invoked his right to counsel and that questioning should have ceased until an attorney had been made available. *Hoyt*, *supra* at 150-151. We read Hoyt's response as an affirmative statement of desire for an attorney. By comparison, the defendant in this case made no such affirmative statement of desire. Compare *Commonwealth* v. *Pennellatore*, 392 Mass. 382, 387 (1984) (no affirmative request where defendant said, "I guess I'll have to have a lawyer for this"); *Commonwealth* v. *Obershaw*, 435 Mass. 794, 798-799 (2002) (no affirmative request where defendant asked whether he could speak with lawyer but declined use of telephone); *Commonwealth* v. *Dubois*, 451 Mass. 20, 24-26 (2008) (no affirmative request where defendant, who understood Miranda warnings, said, "This sounds serious. Maybe I better get a lawyer"). So too here the defend-

ant's statements, "but I just said if I could call my attorney" and "if I had known that this would be like this, I honestly would have brought an attorney," do not reflect an unequivocal invocation of the right to counsel. While this is a very close case, the police were not required to end the interview.[5]

3. *Mistaken identification instruction.* The defendant argues that he was entitled to an instruction on honest mistake, sua sponte, and that its omission was error. We are not persuaded.

The instruction set forth in *Commonwealth* v. *Pressley*, 390 Mass. 617, 620 (1983), regarding an honest but mistaken identification, should be given "when the facts permit it and the defendant requests it." *Commonwealth* v. *Pires*, 453 Mass. 66, 69 (2009). As the defendant acknowledges, defense counsel did not "specifically or formally" request a *Pressley* instruction or object to its omission. "In the absence of a request, a judge is not required to instruct the jury on 'honest mistake.'" *Commonwealth* v. *Rodriguez*, 457 Mass. 461, 474 (2010), quoting from *Commonwealth* v. *Vardinski*, 438 Mass. 444, 457 (2003).

*Judgments affirmed.*

---

[5]When there is an ambiguous reference to an attorney, the better practice is for the police to ask the defendant if he wants to suspend the interrogation and call an attorney. Our longstanding respect, based upon State and not Federal law, for a person's right to access his or her attorney should result in an effort by the police to clarify what the suspect wants to do. See *Commonwealth* v. *Clarke*, 461 Mass. 336, 352-353 (2012).