COMMONWEALTH *vs.* ALEXANDER MOLINA.

Bristol. October 7, 2013. - January 29, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Constitutional Law,* Admissions and confessions, Voluntariness of statement. *Evidence,* Admissions and confessions, Voluntariness of statement. *Practice, Criminal,* Admissions and confessions, Voluntariness of statement.

At a criminal trial, no error arose from the admission in evidence of testimony by a State trooper to statements made by the defendant, where, given that the interview or interrogation during which the defendant made the statements was not custodial until a point, approximately two hours after the interview began, when the trooper became confrontational and coercive, the defendant did not effectively invoke his right to counsel, in that his claimed invocations were made before the point at which the interrogation became custodial [73-75]; where the defendant's statements made prior to the point at which the interrogation became custodial were voluntary, in that nothing about the interview suggested that the defendant's will was overborne in any way [75-77]; and where, with respect to statements made after the point at which the interrogation became custodial, any error resulting from the defendant's waiver of the Miranda rights not being knowing, intelligent, and voluntary was harmless beyond a reasonable doubt [77-80].

INDICTMENTS found and returned in the Superior Court Department on July 21, 2005.

A pretrial motion to suppress evidence was heard by *David A. McLaughlin,* J., and the cases were tried before *Richard T. Moses,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*David Keighley* for the defendant.

*David J. Gold,* Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. Following a jury trial in the Superior Court, the defendant, Alexander Molina, was convicted of murder in the second degree, unlawful possession of a firearm while not at

work or at home, and discharge of a firearm within five hundred feet of a building. The defendant appealed, and the Appeals Court affirmed the convictions. See *Commonwealth* v. *Molina,* 81 Mass. App. Ct. 855 (2012). We granted the defendant's application for further appellate review, limited to issues concerning the admissibility of statements that the defendant made to the police during an interview conducted at the New Bedford police station on March 30, 2005. For the reasons set forth below, we affirm.

1. *Background.* The facts of the case are summarized in the Appeals Court's decision, see *Molina,* 81 Mass. App. Ct. at 856-857; we describe them briefly here. The victim, James Gauoette, was shot to death at around 5 P.M. on March 30, 2005, near the intersection of Ruth and Salisbury Streets in New Bedford. Three eyewitnesses, who were present near that intersection, testified at trial and provided details about their observations of the shooter. Two of the three testified that the shooter wore a mustard-colored or yellow shirt, and two of the three also stated that soon after the shooting, they observed the shooter in a brown jogging suit or brown sweatshirt. At trial, two of the three witnesses identified the defendant as the shooter.

At approximately 10 P.M. on the same day, the police prepared to tow a bluish-green Mazda Protegé automobile that was within the environs of the crime scene. The defendant and an acquaintance crossed the crime scene tape, and the defendant told State Trooper Ann Marie Robertson that the police were towing his car. In response to Robertson's inquiry, the defendant stated that his name was Orlando Figueroa.[1] Robertson then informed the defendant that the vehicle was not his as it was registered to Alex Molina. The defendant responded that Orlando Figueroa was his father's name and that his name was Alex Molina. After this exchange, one of the police officers present asked the defendant if he would go to the police station to answer some questions, and the defendant agreed to do so. Officer David

---

[1]After the shooting, but before the defendant approached his vehicle, which was being towed, police officers who were canvassing the area around the crime scene visited an apartment where a number of people were present, including the defendant. The officers asked all of those present for their names; the defendant stated that his name was Orlando Figueroa.

Brown of the New Bedford police department, with whom the defendant was familiar, drove the defendant to the police station. The defendant was not under arrest or handcuffed. Once they arrived at the police station, Officer Brown remained with the defendant for between thirty and forty-five minutes, but the record contains no evidence relating to any conversation between them.

At around 11:45 P.M., State Trooper Carmelo Serrano, Jr., and Detective Christopher J. Dumont of the New Bedford police department began to interview the defendant at the police station. The interview concluded approximately three and one-half hours later, at 3:15 A.M. on March 31, 2005, after which the two officers drove the defendant back to the area of Ruth Street and dropped him off. Later that same day, after speaking with at least one of the eyewitnesses to the shooting, the police arrested the defendant and he was charged with the victim's murder.

2. *The police interview and the defendant's statements.* The defendant's interview by Trooper Serrano and Detective Dumont took place in the police station in an apparently windowless room measuring twelve feet by eight feet. The interview was videotaped.[2] Serrano was the principal interrogator during the entire interview, and for the most part, the interview was conducted in Spanish; Serrano's first language is Spanish, as is the defendant's. The defendant sat to the side of the desk, with Serrano and Detective Dumont sitting across from the defendant closer to the door. At the beginning of the interview, Serrano presented the defendant a written copy of the Miranda warnings in Spanish, and the defendant read them out loud. When he finished reading, the following interchange took place:

TROOPER SERRANO: "OK. Do you understand your rights?"

DEFENDANT: "Uh-huh, but I just said if I could call my attorney and I was told that it wasn't necessary; that I was coming just to be asked some questions."

---

[2]The facts set out in this section are based on the findings made by the Superior Court judge (motion judge) who heard the defendant's motion to suppress all evidence of his statements made during this police interview, as well as our review of the interview videotapes and a bilingual, Spanish and English transcript of the interview.

TROOPER SERRANO: "Uh huh."

DEFENDANT: "And that I just went to . . . I was sleeping and I get a call that my car was being taken and when I go there and I am told that I have to come here, that someone wants to ask me some questions . . . I don't know what happened because I truly don't know . . . my car was there because it was getting me [*sic*] music equipment."

TROOPER SERRANO: "OK, before . . . do you, do you want to speak with me now . . . I want to ask you some questions; do you want to speak with me now during this time? You understand your rights no?"

DEFENDANT: "Uh-huh, yes I understand."

TROOPER SERRANO: "Having understood your rights, you want to speak with me now?"

DEFENDANT: "Whatever you say."

TROOPER SERRANO: "OK, then if you please sign here; this is just that you were advised of your rights and that . . . you wish to speak with me now."

DEFENDANT: "[T]hat is not that I am a witness for the town hall . . . I have no problem."

TROOPER SERRANO: "[A]nd, Detective Dumont, could you please sign . . . ."

The defendant, Serrano, and Dumont all signed the Miranda waiver form, and the interview began. Serrano initially asked general questions about the defendant, including where he lived, where he worked, the defendant's girl friends, the installation of music equipment in the defendant's car, and why the car had been at the intersection of Ruth and Salisbury Streets. He and the defendant joked some. The questions then began to focus on what the defendant had been doing earlier that day, the sequence of his activities, and especially where he was immediately before and around the time of the shooting — although Serrano had not yet mentioned the fact that a shooting had taken place. The defendant stated that during the afternoon of March 30, he was

taking a nap at the home of one of his girl friends, Patricia. The officers then asked the defendant about the yellow shirt he had been wearing earlier.[3] The defendant told the officers that he was wearing a yellow shirt while he was working on his car in order to prevent his regular clothes from getting dirty. He stated that a man named Angelo (whose last name he did not know) had lent him the yellow shirt and that it must still be in his car. When the officers asked the defendant to provide additional information regarding the individuals who were with Angelo at that time, the defendant said:

> "[I]s it mandatory that I mention a name? Because if I . . . truly, if I had known that this would be like this, I honestly would have brought an attorney because I truly don't even know what has happened; I haven't been informed of what has happened and I am being questioned about, really, I mean, it's like my rights are being violated because I am being questioned on something that I truly don't know . . . I mean because . . . ."

Serrano then informed the defendant for the first time that the officers were investigating a shooting at the intersection of Ruth and Salisbury Streets. Serrano stated that all of them were "grown up men" and that the officers already knew the answers to some of the questions that they were asking. Serrano informed the defendant that if he started lying to the officers, it was the defendant who was going to look suspicious. After that exchange, the officers continued to question the defendant about his clothing, and focused on what he was wearing at various times throughout the day.[4]

Serrano asked the defendant about his conversation with

---

[3]Trooper Carmelo Serrano's initial question concerning the yellow shirt — "Then, where is the . . . yellow sweatshirt that you had on this afternoon?" — was made in response to the defendant's statement that he had worn white "sweats" with red stripes to work that day and then, after showering at a friend's house, had changed into the brown jogging suit he was wearing at the police station. New Bedford police officer Paul J. DeCosta had observed the defendant in the intersection of Ruth and Salisbury Streets at around 5 P.M. on March, 30, 2005, and had noted that he was wearing a yellow shirt. It is reasonable to infer that Serrano learned that the defendant had been wearing a yellow shirt from DeCosta.

[4]Not long thereafter, the defendant made a third reference to an attorney,

police officers at a friend's apartment earlier that evening. He pressed the defendant for the reason he had given the name "Orlando Figueroa" to the police officers at that time. The defendant gave conflicting answers. Throughout this portion of the interview, Serrano and Dumont remained seated, with Serrano leaning back in his chair. The defendant appeared relaxed, and the parties' voices were calm.

There was a fifteen-minute break in questioning at around 1:40 A.M. Following the break, Serrano no longer sat while he was questioning the defendant but instead stood close to the seated defendant, talking down at him. His voice was raised, and he interrupted the defendant, not letting him finish his answers to questions. The interview ended at approximately 3:15 A.M. on March 31, 2005; it had lasted approximately three and one-half hours.

The defendant filed a motion to suppress evidence of the statements he made during the police interview, and it was the subject of an evidentiary hearing before a Superior Court judge (motion judge). The defendant argued that his Miranda waiver was invalid and that he had invoked the right to counsel. The motion judge denied the defendant's motion.[5] At trial, Serrano testified relatively briefly about the police interview of the defendant, and in particular about some of the defendant's state-

---

saying, "[H]onestly officer, you just tell me clearly if I need an attorney." Serrano responded that it was the defendant's decision whether to get an attorney.

[5]The motion judge found that the interview was not custodial at the outset, and did not become custodial until, after approximately two hours, Trooper Serrano's questioning became confrontational and coercive, with Serrano making clear that he believed the defendant was lying. The judge determined that the defendant was properly advised of his Miranda warnings and that a rereading of his Miranda rights once the interview became custodial was not required. As to the defendant's Miranda waiver, the judge concluded that the waiver was valid because the defendant signed a Miranda waiver form; he had had prior experience with law enforcement; even though he was not told that he was a suspect in relation to the shooting that had taken place, officers are not required to provide that information, but its absence is one factor to consider in the totality of the circumstances; and Serrano did not use any force or trickery during the interview. With respect to the defendant's argument that he had invoked his right to counsel, the judge found and ruled that because all the defendant's references to wanting an attorney occurred before the interrogation became custodial, his right to counsel had not yet attached and, therefore, even if the references were sufficient to constitute an invocation of the right, it was, in effect, premature.

ments, but neither the videotapes nor the bilingual translation of the interview were introduced or proffered.[6]

3. *Discussion.* In challenging the admission of his statements made during the police interview, the defendant accepts the premise that the right provided by *Miranda* v. *Arizona*, 384 U.S. 436, 444-445 (1966) (*Miranda*), to have counsel present during a police interview or interrogation only attaches when the interrogation is custodial. His argument in substance is that contrary to the motion judge's conclusion,[7] the interview became custodial at a relatively early stage; and that contrary to the Appeals Court's conclusion, by or at the time the interview did become custodial,[8] the defendant effectively had invoked his right to have counsel present, with the result that all statements thereafter made by him in the interview were inadmissible.[9]

We disagree. In summary, our reasons are the following. As

---

[6]As recounted by Serrano at trial, at the time of the interview, the defendant was dressed in a brown type of suit, and the defendant had told the officers that he was with someone named Patricia at the time of the shooting, but he did not know her last name. Serrano also stated that the defendant denied being in the area of the shooting at the time it occurred, but admitted to wearing a yellow shirt on that day, which he had borrowed from a man named Angelo. In addition, Serrano testified that, when asked what name he gave to police officers who were conducting a preliminary investigation of the area of the shooting soon after it occurred, the defendant provided various names other than his real name, including Orlandito [*sic*] Figueroa, which the defendant identified as his father's name and said that he was using it. Trooper Serrano further testified that the defendant told him he had showered at his friend Johan's house on the afternoon of the shooting, that he had left some of his clothes there, and that his sister, Wanda, had picked up the defendant's clothing from Johan's house.

[7]See note 5, *supra.*

[8]The defendant argued in his brief that his first attorney reference constituted an invocation of the right to counsel. However, during oral argument, the defendant conceded that he was only entitled to counsel once the interview became custodial, and he could not in good faith argue that it was custodial from the outset.

[9]In affirming the denial of the defendant's motion to suppress his statements, the Appeals Court assumed for the sake of argument that the entire police interview was custodial, but concluded that the defendant had never sufficiently invoked his right under *Miranda* v. *Arizona*, 384 U.S. 436, 444-445 (1966) (*Miranda*), to have counsel present. *Commonwealth* v. *Molina*, 81 Mass. App. Ct. 855, 866 (2012). According to the Appeals Court, the defendant's first reference to an attorney was not an invocation of the right to counsel, but rather a request for clarification about the nature of the questioning. *Id.* at 866-867. Likewise, in that court's view, the defendant's second attorney

our cases indicate, the defendant is correct that *Miranda* and its protective right to counsel under the Fifth Amendment to the United States Constitution only apply to a custodial interrogation. See *Commonwealth* v. *Baye*, 462 Mass. 246, 253 (2012), quoting *Commonwealth* v. *Hilton*, 443 Mass. 597, 608 (2005), *S.C.*, 450 Mass. 173 (2007) ("the requirements of [*Miranda*] are not triggered unless the interrogation is custodial"). See generally *Commonwealth* v. *Groome*, 435 Mass. 201, 215-216 (2001). Here, we conclude that the defendant's interview or interrogation at the New Bedford police department was not custodial at least until the point identified by the motion judge. That conclusion necessarily leads to two further questions: (1) whether, as is required, all the defendant's statements that were admitted in evidence at trial, including the statements made during the non-custodial portion of the interrogation, were voluntary; and (2) whether, in relation to any statements made during the custodial portion, the defendant had validly waived his Miranda rights and had not invoked his right to counsel. We answer the first question yes, and conclude there is no need to resolve the second because even if we accept for argument that the defendant's Miranda waiver was not valid, the resulting error was harmless beyond a reasonable doubt.

a. *Standard of review.* "When reviewing the denial of a motion to suppress, we accept the judge's findings of fact and will not disturb them absent clear error," but we independently determine "the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Tremblay*, 460 Mass. 199, 205 (2011). Questions of credibility rest solely with the motion judge, who had the opportunity to observe the witnesses, see, e.g., *Commonwealth* v. *Martin*, 447 Mass. 274, 280 (2006), quoting *Commonwealth* v. *Thinh Van Cao*, 419 Mass. 383, 384, cert. denied, 515 U.S. 1146 (1995), but "we will 'take an independent view' of recorded confessions and make judgments with respect to their contents without deference to the fact finder, who 'is in no better position to evaluate the[ir] content and significance.' " *Commonwealth* v.

reference did not qualify as an unequivocal invocation of the right to counsel but rather represented a stalling tactic because he did not want to answer the interrogator's question. *Id.* at 867-868.

*Hoyt*, 461 Mass. 143, 148-149 (2011), quoting *Commonwealth v. Novo*, 442 Mass. 262, 266 (2004).

b. *Custody.* The defendant argues that the police interrogation became custodial at approximately the same time that he made his second reference to an attorney — around 12:30 A.M. " 'The crucial question' in determining whether an interrogation is custodial is whether 'a reasonable person in the defendant's position would have believed that he was in custody.' " *Baye*, 462 Mass. at 253, quoting *Commonwealth* v. *Damiano*, 422 Mass. 10, 13 (1996). There are four factors that the court considers to determine whether an interrogation is custodial: "(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest." *Groome*, 435 Mass. at 211-212. See *Commonwealth* v. *Sneed*, 440 Mass. 216, 220 (2003) (same). "There is no specific formula for weighing the relevant factors"; however, "[r]arely is any single factor conclusive." *Id.*, quoting *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984). Moreover, an interrogation that begins as noncustodial can become custodial. See, e.g., *Baye*, 462 Mass. at 253, quoting *Hilton, supra* at 611-612.

The defendant voluntarily accompanied the police to the station for questioning. See *Hilton*, 443 Mass. at 610. The interrogation did take place at the police station, but this is not dispositive of the custody inquiry. See *id.* at 609-610. Additionally, even though the defendant was interviewed in a relatively small room — twelve feet by eight feet — the interviewing officer's relaxed and informal tone in the beginning of the interview mitigated the room's small size. At the start of the interview there was small talk, including joking among the defendant and the two officers. See *Groome*, 435 Mass. at 214-215.

The defendant insists that Trooper Serrano's statements

approximately forty-five minutes into the interview that the defendant was lying were "hectoring" and "accusatory" and demonstrated to the defendant that he was a suspect. An officer's belief that the defendant was a suspect does not control; rather, what matters for purposes of a custody inquiry is whether that belief was conveyed to the defendant.[10] See, e.g., *Groome*, 435 Mass. at 214; *Bryant*, 390 Mass. at 738. See also *Sneed*, 440 Mass. at 221 (fact that defendant was target of investigation did not inform custody determination because officers did not inform defendant of target status). Despite the defendant's contention, we do not understand this exchange about lying to express such a belief: Trooper Serrano merely informed the defendant what had happened at Ruth and Salisbury Streets and that this was the focus of their questioning. See *Commonwealth v. Kirwan*, 448 Mass. 304, 312-313 (2007) (preliminary questioning designed to dispel or confirm suspicion does not make interrogation custodial). Moreover, Serrano's tone of voice indicated that this exchange was explanatory rather than accusatory. See *Hilton*, 443 Mass. at 610 (style and tone of questioning was neither aggressive nor confrontational). Likewise, Serrano did not raise his voice at this point, keeping the questioning and interaction nonaggressive. See, e.g., *Sneed, supra* at 221 ("no evidence of shouting or raised voices on the part of the investigators"); *Bryant, supra* at 738 (questioning not aggressive).

It is true, as the motion judge determined, that the character of the police interrogation shifted at approximately 1:55 A.M., following the fifteen-minute break. At that time, both Serrano and Dumont no longer were sitting in relaxed fashion, but remained standing close to — one might characterize the position as standing almost over — the defendant. For the rest of the interview, Serrano either questioned the defendant from this stance or did so sitting on the edge of a desk in very close proximity to the defendant. Moreover, Serrano's interrogation style was dramatically different at this point: rather than asking questions, many of which were open-ended, at a relatively

---

[10]At the time they were interviewing the defendant, the police had not yet spoken to anyone who had identified the defendant as the shooter; the police spoke to the first person to do so later in the morning of March 31, 2005, after the defendant's interview had concluded.

leisurely pace, he peppered the defendant with questions and statements in rapid fashion; he repeatedly asserted that the defendant was lying to the officers; his voice was raised; and his tone was far more argumentative and aggressive than the one he previously had used. We accept the motion judge's conclusion that the interrogation became custodial at this time. Accordingly, because the defendant's claimed invocations of the right to counsel all were made before the point at which the interrogation became custodial, the defendant did not effectively invoke that right.[11] See *Groome*, 435 Mass. at 215-216.

c. *Voluntariness of the statements.* Where a defendant makes statements to the police while "not in custody, we focus solely on the question whether his statements were voluntary." *Commonwealth* v. *Durand*, 457 Mass. 574, 595 (2010).[12] "A voluntary· statement is one that is the product of a rational intellect and a free will, and not induced by physical or psychological coercion." *Tremblay*, 460 Mass. at 207, quoting *Commonwealth* v. *LeBlanc*, 433 Mass. 549, 554 (2001) (quotations omitted). The

---

[11]In *Commonwealth* v. *Baye*, 462 Mass. 246, 263 (2012), this court raised but declined to reach the question whether the police are required to honor a defendant's precustodial invocation of Miranda rights. We decline to consider that question here, as neither the defendant nor the Commonwealth has raised the point. Further, and in contrast to *Baye*, see *id.* at 249-250, 253, the defendant's claimed invocations of the right to counsel in this case are ambiguous at best, and the record does not permit a meaningful evaluation of at least the first claimed invocation ("but I just said if I could call my attorney and I was told that it wasn't necessary; that I was coming just to be asked some questions").

[12]Although the defendant summarily raised the voluntariness of his statements in the memorandum he filed in support of his motion to suppress, the issue was not mentioned at the hearing on that motion, and the motion judge did not address it. At trial, the defendant did not challenge the voluntariness of his statements, and in like fashion, the defendant has not raised a voluntariness challenge on appeal. Nevertheless, we address the issue here because voluntariness always is a factor to be considered when evaluating the admissibility of a defendant's statements against him in a criminal trial. Cf. *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997) ("An appellate court is free to affirm a ruling on grounds different from those relied on by the motion judge if the correct or preferred basis for affirmance is supported by the record and the findings. Indeed, if the facts found by the judge support an alternative legal theory, a reviewing court is free to rely on an alternative legal theory"); *Foley* v. *Lowell Sun Publ. Co.*, 404 Mass. 9, 11 (1989). Here, the motion judge's findings and the interview videotapes permit us to resolve whether the defendant's statements were voluntary. See *Commonwealth* v. *Sneed*, 440 Mass. 216, 222 (2003).

ultimate inquiry is "whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." *Durand, supra* at 595-596, quoting *Commonwealth* v. *Souza*, 428 Mass. 478, 483-484 (1998). "Relevant factors [to this inquiry] include, but are not limited to, 'promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings.' " *Commonwealth* v. *Selby*, 420 Mass. 656, 663 (1995), quoting *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986).

Our review of the videotapes and translation of the defendant's police interview persuades us that all of his statements were voluntary. Neither officer offered misleading comments or engaged in any trickery or deception, contrast *Baye*, 462 Mass. at 257-261, and there is simply nothing about the interview, including the more aggressive tone and manner adopted by Serrano in the interview's last hour, that suggests the defendant's will was overborne in any way. See *Durand*, 457 Mass. at 597-598. The most problematic aspect of the interview is the possibility, suggested by the defendant's statement at the interview's beginning, that he had been told by a police officer or representative that he did not need an attorney. See *Groome*, 435 Mass. at 205-206, 215-216 nn.20, 21 (police officer's response to defendant participating in noncustodial interview that he did not "need an attorney" constituted improper advice, but did not render defendant's statements involuntary or require suppression in circumstances of case). However, the record here does not contain any other information concerning the nature or extent of the alleged conversation between the defendant and a police officer, or the identity of that officer. Although law enforcement officers should avoid such comments, their presence does not necessarily compel suppression of a defendant's statements.[13] See *Com-*

---

[13] Also relevant to the voluntariness of the defendant's statements is his apparent belief that he was at the police station to answer questions about his

*monwealth* v. *Gaboriault*, 439 Mass. 84, 88 (2003); *Groome, supra.*

"The presence of one or more factors suggesting a statement may have been made involuntarily is not always sufficient to render the statements involuntary." *Selby*, 420 Mass. at 664. Here, the defendant came to the police station voluntarily and was not restrained in any way while he was there. *Commonwealth* v. *Cruz*, 373 Mass. 676, 689 (1977). The defendant's incriminating statements were made some time after an officer commented that an attorney was not necessary. See *Durand*, 457 Mass. at 596-597 (incriminating statements not made in response to police tactics). Cf. *Novo*, 442 Mass. at 271 (misstatement of "fifth" Miranda warning came at beginning of interview and did not render subsequent statements involuntary). Additionally, the defendant appeared to be sober, alert, oriented, and lucid, see *Commonwealth* v. *Edwards*, 420 Mass. 666, 674 (1995), and appeared to understand the officers.[14] See *Commonwealth* v. *Cryer*, 426 Mass. 562, 566 (1998). The interrogation lasted for approximately three and one-half hours, with a fifteen-minute break. See *Commonwealth* v. *Tolan*, 453 Mass. 634, 643-644 (2009) (defendant's statements over eleven-hour interview voluntary where he was permitted to take several breaks). In sum, the totality of the circumstances here supports the conclusion that the defendant's statements were voluntary.

d. *Validity of Miranda waiver.* Our conclusion on the issue of voluntariness does not resolve all issues raised in this case concerning the admissibility of the defendant's statements.

---

vehicle rather than about the shooting at the intersection of Ruth and Salisbury Streets. As the motion judge noted, however, the police are not required to "inform a suspect of the nature of the crime about which he is to be interrogated," and failure to do so does not itself render a statement involuntary. *Commonwealth* v. *Wills*, 398 Mass. 768, 777 (1986), quoting *Commonwealth* v. *Medeiros*, 395 Mass. 336, 345 (1985) (noting that not knowing subject of questioning is factor in determining voluntariness of Miranda waiver).

[14] In the course of discussing why he gave a false name to the police, the defendant made references to having a nervous disorder. There is nothing else in the record that relates to the existence or nature of the claimed disorder, and in any event, evidence of a mental condition alone does not require a finding that a person's statements are involuntary. *Commonwealth* v. *Benoit*, 410 Mass. 506, 515 (1991). Rather, where the statements are a product of a putative defendant's mental illness, a finding of involuntariness is required. See generally *id.*

Insofar as the trial evidence included statements made by the defendant during the custodial portion of the interview,[15] a separate question arises whether the defendant had validly waived his Miranda rights before making them. See *Edwards*, 420 Mass. at 670, 673 (voluntariness of statement requires related but separate inquiry from validity of Miranda waiver). For any statements that are the product of a custodial interrogation to be admissible, there must be a knowing, intelligent, and voluntary waiver, *id.* at 670, citing *Miranda*, 384 U.S. 436 (1966), and the Commonwealth must prove "the validity of a Miranda waiver beyond a reasonable doubt." *Commonwealth* v. *Jones*, 439 Mass. 249, 256 (2003), quoting *Commonwealth* v. *Day*, 387 Mass. 915, 921 (1983). The defendant argues in part that his Miranda waiver was invalid as he did not fully understand his Miranda rights.

The defendant received Miranda warnings only once, at the beginning of his interview with the police, and we must assess the validity of the waiver at that time.[16] The circumstances surrounding the defendant's waiver were less than ideal. It was immediately after reading the sheet with the Miranda warnings printed in Spanish that the defendant stated he had just been told by someone at the police station that it was "not necessary" for him to have an attorney present; the defendant was also under the belief that he was being questioned about his car rather than the shooting at the intersection of Ruth and Salisbury Streets. See note 13, *supra*. Moreover, when asked if he was willing to talk with police despite these rights, the defendant responded with, "[w]hatever you say," before signing the Miranda waiver form. Nonetheless, we do not need to resolve the question whether these considerations render the defendant's Miranda waiver invalid because, even assuming that they

---

[15]Included among the defendant's statements about which Trooper Serrano testified was that the defendant's sister Wanda had picked up his clothes from his friend Johan's house. See note 6, *supra*. The defendant did not make this statement until after the police interview had become custodial.

[16]The motion judge rejected the claim that the police were required to re-administer Miranda warnings at the point the interview became custodial — about two hours after the interview commenced — and the defendant does not raise any issue concerning this point on appeal. We see no need to consider it. See *Commonwealth* v. *Sirois*, 437 Mass. 845, 851-852 (2002), and cases cited.

did, the resulting error in admitting the defendant's statement about his sister picking up his clothes (see notes 6 and 15, *supra*) was harmless beyond a reasonable doubt.[17]

When analyzing whether an error was harmless beyond a reasonable doubt, "we ask whether, on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the jury and did not contribute to the jury's verdicts." *Commonwealth* v. *Tyree*, 455 Mass. 676, 701 (2010). Factors the court considers in determining whether the erroneous admission of particular evidence is harmless include the importance of the evidence to the prosecution's case as well as to the premise of the defense; the frequency of reference to that evidence; and the weight of evidence of the defendant's guilt. See *Hoyt*, 461 Mass. at 155, quoting *Commonwealth* v. *Dagraca*, 447 Mass. 546, 553 (2006). A conviction is most susceptible to being overturned when the "strength of the Commonwealth's case radiates from a core of tainted evidence." *Tyree*, *supra* at 701-702.

As stated previously, at trial, Trooper Serrano was the sole source of evidence concerning the defendant's statements. The defendant had made most of the statements that Serrano recounted before the interview became custodial. These included statements that the defendant was with someone named Patricia at the time of the shooting, but did not know her last name; that he was not specifically in the area of the shooting at the time it occurred; and that, earlier in the day of the shooting, the defendant had been wearing a yellow shirt that was given to him by someone named Angelo, but the defendant did not know Angelo's last name.[18]

---

[17]Although he did not do so before the Appeals Court, the defendant raised the validity of his Miranda waiver in his pretrial motion to suppress and renewed his objections at the beginning of his trial. The error is thus preserved, and we review it to determine whether it was harmless beyond a reasonable doubt. See *Commonwealth* v. *Molina*, 439 Mass. 206, 211-212 (2003).

[18]Other precustodial statements made by the defendant to which Serrano testified included that the defendant had identified himself to the investigating officers as Orlandito [*sic*] Figueroa, which he said was his father's name; and that he showered at his friend Johan's and left some of this clothes there.

The main issue at trial was the identity of the shooter. In light of the evidence supplied by two eyewitnesses that the shooter had on a yellow or mustard-colored shirt, the defendant's precustodial admission that he had been wearing a yellow shirt was obviously significant; the defendant's vague, alibi-attempting statement (also precustodial) about being with his girl friend Patricia was arguably important as well. But the fact that the defendant's sister had picked up his clothes from his friend Johan's house was neither central to the Commonwealth's theory of the case — that the defendant was the shooter — nor the defendant's theory of the case — that someone else was the shooter. Additionally, the statement did not go to an element of the crime, see *Commonwealth* v. *Vasquez*, 456 Mass. 350, 362 (2010), and was never mentioned again by any other witness or the prosecutor following Serrano's testimony. Contrast *Hoyt*, 461 Mass. at 155. We therefore conclude that even if the defendant's Miranda waiver was invalid, the admission of the defendant's postcustodial statement about his sister picking up his clothes was harmless beyond a reasonable doubt, and does not require reversal of his convictions.

*Judgments affirmed.*